W. EUGENE DAVIS, Circuit Judge:
In this toxic tort case, we consider whether the district court abused its discretion in excluding the opinion of a physician on the causal relationship between Plaintiffs exposure to industrial chemicals and his pulmonary illness. We find no abuse of discretion and affirm.
I.
Bob T. Moore was employed as a delivery truck driver for Consolidated Freightways, Inc. (“Consolidated”), a motor freight company. On the morning of April 23,1990, Moore delivered several drums of chemicals manufactured by Dow Corning Corp. (“Dow”) to Ashland Chemical Inc.’s (“Ashland”) terminal in Houston. When Moore opened the back door of his trailer, he smelled a chemical odor that caused him to suspect that a drum was leaking. Moore and the Ashland plant manager, Bart Graves, identified two leaking drums and removed them from the trailer. Mr. Graves contacted Dow and requested cleanup instructions and a copy of the material safety data sheet (“MSDS”) for the spilled chemicals. The MSDS identified the contents of the leaking drum and health hazards associated with the contents.[1] The *272 MSDS stated that the chemical solution included hazardous ingredients, most notably Toluene. It warned that depending upon the level and duration of the exposure to fumes from the chemicals, irritation or injury to various organs, including the lungs, could result.
After Moore and Graves obtained cleanup instructions, they put the leaking drums into larger salvage drums. Moore and another Consolidated employee then proceeded to place absorbent material on the spilled chemicals, sweep them up, and dispose of them. The men were engaged in this cleanup for forty-five minutes to an hour. After the cleanup, Moore returned to the Consolidated terminal. At tidal, he testified that about an hour after finishing the cleanup, he began experiencing symptoms, including dizziness, watery eyes, and difficulty in breathing. However, Moore was able to drop off another Consolidated trailer as requested by his supervisor.
When he completed this delivery, Moore returned to Consolidated’s terminal and told his supervisor that he was sick. The supervisor sent Moore to the company doctor. The next day, Moore saw his family physician. After two to three weeks of treatment by the family physician, Moore placed himself under the care of a Dr. Simi, a pulmonary specialist. Dr. Simi released Moore to return to work on the 11th day of June, 1990. After working several days, Moore terminated his employment due to difficulty breathing. On three occasions in the summer of 1990, Moore also consulted Dr. Daniel E. Jenkins, a pulmonary specialist. Dr. Jenkins diagnosed Moore’s condition as reactive airways dysfunction syndrome (“RADS”), an asthmatic-type condition. In November of 1990, Moore consulted another pulmonary specialist, Dr. B. Antonio Alvarez, who became his primary treating physician. Dr. Alvarez confirmed Dr. Jenkins’s diagnosis and treated Moore for RADS.
Moore reported to his physicians that he had smoked approximately a pack of cigarettes a day for approximately twenty years, and he continued to smoke at the time of trial. He also reported that on April 23, 1990, when he was exposed to the Dow chemical, he had just returned to work following a bout with pneumonia. Moore also related a history of childhood asthma to his treating physician.
Moore and his wife filed suit against Ash-land Chemical, Inc., Ashland Oil, Inc., and others, primarily on grounds that Ashland was negligent in insisting that Moore expose himself to vapors created by the chemical spill. More specifically, Moore complained that Ashland’s employee, Bart Graves, should have permitted Moore to return to Consolidated’s terminal where other employees could have cleaned up the spill. He also complained that Graves did not permit him to use a respirator during the cleanup. Ash-land removed the suit to federal court on the basis of diversity jurisdiction.
After extensive discovery and motion practice dealing particularly with whether Moore’s expert physicians, Dr. Jenkins and Dr. Alvarez, would be permitted to testify, the case proceeded to trial before a jury. At the conclusion of the trial, the jury answered the following interrogatory in the negative: “Do you find, from a preponderance of the evidence, that the negligence, if any, of the person named below proximately caused the injury in question: ... (b) Ashland Chemical, Inc. and/or Ashland Oil, Inc.” Thereafter, the distinct court entered a take nothing judgment against Moore. On appeal, a divided panel of this Court concluded that the district court had erred in refusing to allow Dr. Jenkins, one of Moore’s experts, to give an opinion on the cause of Moore’s illness, and reversed the district court’s judgment and remanded the case for a new trial. Moore v. Ashland Chem., Inc., 126 F.3d 679 (5th Cir.1997). We granted rehearing to *273 consider this case en banc and to clarify the standards district courts should apply in determining whether to admit expert testimony.
II.
In this appeal we focus on the trial court’s refusal to permit one of Moore’s medical witnesses, Dr. Daniel E. Jenkins, to give an opinion on the cause of Moore’s illness. Some factual and procedural background is necessary to understand the arguments of the parties.
Moore sought to call two medical witnesses, Dr. Jenkins and Dr. Antonio Alvarez. Dr. Jenkins, a well-qualified medical specialist, was certified by the American Board of Internal Medicine in 1947. He also had special training and taught in the fields of pulmonary disease, allergy, and environmental medicine.[2] Dr. Jenkins saw Moore on three occasions. He examined Moore, performed a series of tests, and reviewed Moore’s medical records. He concluded that Moore was suffering from RADS. Based upon his examination and tests, Dr. Jenkins expressed the opinion that Moore’s RADS had been caused by Moore’s exposure to vapors from the chemical spill at Ashland’s facility in April of 1990. We will discuss later in more detail the reasons Dr. Jenkins assigned for his opinion. Generally, he relied upon the MSDS, which warned that exposure to the Toluene solution could be harmful to the lungs, his examination and test results, and the close, temporal connection between Moore’s exposure to the Toluene solution and the onset of symptoms.
Dr. Alvarez, who was a former student of Dr. Jenkins, agreed with Dr. Jenkins about the cause of Moore’s RADS. Dr. Alvarez was Moore’s primary treating physician. In addition to the reasons relied on by Dr. Jenkins, Dr. Alvarez supported his theory of causation with a report of a study on RADS co-authored by Dr. Stuart Brooks that he found in a medical magazine.[3] One ease study in the report involved a clerk who was exposed to a Toluene mixture in a small, enclosed room for two and one-half hours. Dr. Jenkins initially stated in his deposition that he knew of no reported literature that supported his causation opinion. During his in limine testimony outside the presence of the jury at trial, Dr. Jenkins, for the first time, pointed to the Brooks study relied on by Dr. Alvarez.
Dr. Jenkins admitted that Moore was his first RADS patient with a history of exposure to Toluene. He had conducted no research on this subject. Dr. Jenkins had previously treated other patients whose RADS he attributed to exposure to chemicals that were known to irritate the airways. However, he conceded that the chemicals involved with these previous patients were stronger and more irritating than the Toluene solution to which Moore was exposed. Dr. Jenkins made no attempt to explain how any of the other chemicals that he believed caused RADS in his earlier patients had properties similar to the Dow Toluene solution.
The district court, after reviewing Dr. Jenkins’s deposition and listening to his in li-mine testimony, decided to exclude his causation opinion. The court did permit Dr. Jenkins to testify about his examination of Moore, the tests he conducted, and the diagnosis he reached. The only feature of Dr. Jenkins’s testimony the court excluded was his opinion that the Toluene solution caused Moore’s RADS. The district court concluded that Dr. Jenkins had no scientific basis for this opinion, that it was not sufficiently reliable under Fed.R.Evid. 702, and that it would be inconsistent with the court’s gatekeeper role under Daubert to admit this opinion.
*274 The district court decided to admit Dr. Alvarez’s causation opinion even though it was essentially identical to Dr. Jenkins’s proffered opinion. The district court was apparently convinced that Dr. Alvarez’s opinion linking the RADS to Moore’s exposure to the Toluene solution was more reliable than Dr. Jenkins’s opinion because Dr. Alvarez had been the treating physician, and also because he had relied from the outset on the Brooks study and therefore had some support from the scientific literature for his conclusion. In view of the verdict, the Defendants do not challenge the district court’s decision to admit Dr. Alvarez’s opinion. Thus, the propriety of this ruling is not presented to us for review.
The single defense expert, Dr. Robert Jones, was the third medical witness to testify. Based upon his review of the medical records, Dr. Jones concluded that Moore did not have RADS; rather, according to Dr. Jones, Moore suffered from a form of bronchial asthma. Dr. Jones further testified that the evidence in the case was insufficient to allow him to conclude that Moore’s exposure to Toluene caused his pulmonary problems. Dr. Jones’s conclusion was reinforced by Moore’s medical history, which included conditions that Dr. Jones thought were much more likely triggering agents for RADS. These conditions included Moore’s history as a heavy smoker for approximately twenty years, his history of asthma, and his recent bout with pneumonia. Dr. Jones also testified that the scientific literature revealed that Toluene and similar substances have a low potential for causing lung injury except when encountered in such high dosages that the person is overcome and passes out.
With this background, we now turn to the issue presented by this appeal: whether the district court erred in excluding Dr. Jenkins’s causation testimony.
III.
A.
Fortunately, the Supreme Court recently resolved a disagreement among the circuits about the standard for reviewing a district court’s admission or exclusion of expert testimony. In General Electnc Co. v. Joiner, - U.S. -, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997), the Court held that we should review such decisions for an abuse of discretion. In evaluating whether the district court abused its discretion in excluding Dr. Jenkins’s testimony on causation, the Supreme Court’s decisions in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and Joiner control our analysis.
In DaubeH, the lower courts considered the admissibility of expert testimony on medical causation. The expert witnesses sought to testify that ingestion of Bendeetin, a prescription anti-nausea drug, by several mothers caused birth defects in their children. The lower courts excluded the evidence on the basis that the experts’ methodology was not generally accepted in the scientific community and had not been subjected to peer review. The Supreme Court, speaking through Justice Blackmun, first concluded that the “Frye doctrine,”[4] requiring that a theory be generally accepted in the scientific community before it can be the basis of an expert’s opinion, was not a controlling principle in federal trials. Daubert, 509 U.S. at 589, 113 S.Ct. at 2794. Justice Blackmun then turned to Rule 702 of the Federal Rules of Evidence[5] and the proper test for admissibility of scientific evidence.
That the Frye test was displaced by the Rules of Evidence does not mean, however, that the Rules themselves place no limits on the admissibility of purportedly scientific evidence. Nor is the trial judge disabled from screening such evidence. To *275 the contrary, under the Rules the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.
The primary locus of this obligation is Rule 702, which clearly contemplates some degree of regulation of the subjects and theories about which an expert may testify. “If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue” an expert “may testify thereto.” The subject of an expert’s testimony must be “scientific ... knowledge.” The adjective “scientific” implies a grounding in the methods and procedures of science. Similarly, the word “knowledge” connotes more than subjective belief or unsupported speculation. The term “applies to any body of known facts or to any body of ideas inferred from such facts or accepted as truths on good grounds.” Webster’s Third New International Dictionary 1252 (1986). Of course, it would be unreasonable to conclude that the subject of scientific testimony must be “known” to a certainty; arguably, there are no certainties in science. But, in order to qualify as “scientific knowledge,” an inference or assertion must be derived by the scientific method. Proposed testimony must be supported by appropriate validation — i.e., “good grounds,” based on what is known. In short, the requirement that an expert’s testimony pertain to “scientific knowledge” establishes a standard of evidentiary reliability.
Daubert, 509 U.S. at 589-90, 113 S.Ct. at 2794-95 (emphasis in original) (internal citations omitted).
The Court stated further that:
Rule 702 further requires that the evidence or testimony “assist the trier of fact to understand the evidence or to determine a fact in issue.” This condition goes primarily to relevance. “Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful.”
Id. at 591, 113 S.Ct. at 2795 (citation omitted). The Court then proceeded to enumerate a five-factor, non-exclusive, flexible test for district courts to consider when assessing whether the methodology is scientifically valid or reliable. These factors include: (1) whether the expert’s theory can be or has been .tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error of a technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) the degree to which the technique or theory has been generally accepted in the scientific community. Id. at 593-95,113 S.Ct. at 2796-97.[6]
The Supreme Court concluded by pointing out that important differences exist between truthseeking in the courtroom and in the laboratory:
Scientific conclusions are subject to perpetual revision. Law, on the other hand, must resolve disputes finally and quickly. The scientific project is advanced by broad and wide-ranging consideration of a multitude of hypotheses, for those that are incorrect will eventually be shown to be so, and that in itself is an advance. Conjectures that are probably wrong are of little use, however, in the project of reaching a quick, final and binding legal judgment— often of great consequence — about a particular set of events in the past. We recognize that, in practice, a gatekeeping role *276 for the judge, no matter how flexible, inevitably on occasion will prevent the jury from learning of authentic insights and innovations.
Daubert, 509 U.S. at 597, 113 S.Ct. at 2798-99. The Court remanded the case to permit the lower courts to evaluate their rulings in light of the multi-factor, flexible test it had just announced.
Proeedurally, Daubert instructs us that the district court must determine admissibility under Rule 702 by following the directions provided in Rule 104(a).[7] Rule 104(a) requires the judge to conduct preliminary fact-finding and to make a “preliminary assessment of whether the reasoning or methodology underlying the testimony' is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.” Daubert, 509 U.S. at 592-93, 113 S.Ct. at 2796.
Thus, the party seeking to have the district court admit expert testimony must demonstrate that the expert’s findings and conclusions are based on the scientific method, and, therefore, are reliable. This requires some objective, independent validation of the expert’s methodology. The expert’s assurances that he has utilized generally accepted scientific methodology is insufficient. See Daubert v. Merrell-Dow Pharmaceuticals, Inc., 43 F.3d 1311, 1316 (9th Cir.1995) (on remand). The proponent need not prove to the judge that the expert’s testimony is correct, but she must prove by a preponderance of the evidence that the testimony is reliable. See In re Paoli R.R. Yard PCB Litigation, 35 F.3d 717 (3d Cir.1994); see also 2 Stephen A. SaltzbuRG et al„ Federal Rules of Evidenoe Manual 1229-40' (7th ed.1998).
In sum, the law cannot wait for future scientific investigation and research. We must resolve cases in our courts on the basis of scientific knowledge that is currently available. The inquiry authorized by Rule 702 is a flexible one; however, a scientific opinion, to have evidentiary relevance and reliability, must be based on scientifically valid principles.
Last term, in General Electric Co. v. Joiner, - U.S.-, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997), the Supreme Court gave us helpful insight into the application of the Daubert principles. In Joiner, the plaintiff sued, claiming that his small-cell lung cancer was caused by his exposure to polychlorinated biphenyls (“PCBs”) in the workplace. The plaintiff offered expert testimony to establish his causation theory. The district court ruled that the testimony was scientifically unreliable and refused to admit the proffered evidence. The Eleventh Circuit Court of Appeals reversed and held that the simple abuse of discretion standard of review did not apply to the ruling; rather, “a particularly stringent standard of review” applied “to the trial judge’s exclusion of expert testimony” that resulted in the dismissal of the suit. Joiner v. General Elec. Co., 78 F.3d 524, 529 (11th Cir.1996). The Supreme Court reversed, holding that the usual abuse of discretion standard generally applied to eviden-tiary rulings also applied to the admission or exclusion of expert testimony. General Elec. Co. v. Joiner, - U.S. -, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). The Supreme Court’s treatment of several of Joiner’s arguments is instructive to both trial courts and courts of appeals in the area of admissibility of expert testimony.
The Court emphasized that a district court, while acting as a gatekeeper for expert evidence, must evaluate whether there is an adequate “fit” between the data and the opinion proffered. Joiner, 118 S.Ct. at 519. One of the bases for the experts’ causation opinion in Joiner was animal studies on the effects on rats injected with large doses of PCBs. In analyzing Joiner’s argument, the Court observed that
[rjather than explaining how and why the experts could have extrapolated their opinions from these seemingly far-removed animal studies, respondent chose to proceed as if the only issue [was] whether animal studies can ever be a proper foundation for *277 an expert’s opinion. Of course, whether animal studies can ever be a proper foundation for an expert’s opinion was not the issue. The issue was whether these experts’ opinions were sufficiently supported by the animal studies on which they purported to rely. The studies were so dissimilar to the facts presented in this litigation that it was not an abuse of discretion for the District Court [sic] to have rejected the experts’ reliance on them.
Id. at 518 (internal quotation and citation omitted).
The Court next considered four published epidemiological studies on which the proffered experts relied to determine whether they provided a sufficient basis for the experts’ opinion. The Court observed that the authors of the first two studies, while finding that the rate of cancer deaths among former employees at plants where workers were exposed to PCBs was higher than might have been expected, nevertheless concluded that “there were apparently no grounds for associating lung cancer deaths (although increased above expectations) and exposure in the plant.” Joiner, 118 S.Ct. at 518 (citation omitted). The Court concluded that given that the authors of the article were “unwilling to say that PCB exposure had caused cancer among the workers they examined, their study did not support the experts’ conclusion that Joiner’s exposure to PCBs caused his cancer.” Id. at 518.[8] The Court next referred to the two remaining studies, one of which made no mention of PCBs and the other in which the PCB-exposed group had also been subjected to additional potential carcinogens. The Court observed that the district court was entitled to conclude that these studies were likewise no help to the experts in supporting their opinions. Id. at 519.
The Court concluded its discussion of Joiner’s arguments as follows:
Respondent points to Daubert’s language that the “focus, of course, must be solely on principles and methodology, not on the conclusions that they generate.” He claims that because the District Court’s disagreement was with the conclusion that the experts drew from the studies, the District Court committed legal error and was properly reversed by the Court of Appeals. But conclusions and methodology are not entirely distinct from one another. Trained experts commonly extrapolate from existing data. But nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the ipse dixit of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered. That is what the District Court did here, and we hold that it did not abuse its discretion in so doing.
Jojner, 118 S.Ct. at 519 (internal citations omitted).
B.
With this background, we turn to the record evidence in this case to apply the Supreme Court’s directives in’ Daubert and Joiner, and to determine whether the district court abused its discretion in excluding Dr. Jenkins’s testimony.
Dr. Jenkins pointed to the following support for his causation conclusion: (1) the MSDS from Dow warned that exposure to fumes from the Toluene solution could cause injury to the lungs; (2) Moore had an onset of symptoms shortly after his exposure to the Toluene solution; (3) although Dr. Jenkins did not initially rely on the Brooks article, when it was called to his attention at trial by counsel, he did claim to have knowledge of the article and stated that he had relied on it; (4) his training and experience; and (5) his examination and test results.
The district court was entitled to conclude that the above bases for Dr. Jenkins’s opinion were individually and collectively inadequate under Daubert. First, Dr. Jenkins’s training and experience and his examination and tests, items 4 and 5 above, were obvious *278 ly important to his diagnosis. However, Dr. Jenkins gave no reason why these items were helpful in reaching his conclusion on causation. He admitted that he had never previously treated a patient who had been exposed to a similar Toluene solution. Dr. Jenkins was a highly qualified pulmonary specialist, but, as the Seventh Circuit observed in Rosen v. Ciba-Geigy Corp., 78 F.3d 316 (7th Cir.1996), “[u]nder the regime of Daubert a district judge asked to admit scientific evidence must determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist.” Id. at 318 (internal citation omitted).
With respect to the Brooks article, item 3 above, the authors made it clear that their conclusions were speculative because of the limitations of the study. Also, in the single study involving exposure to Toluene fumes, the level and duration of the exposure was several times greater than Moore’s exposure.
The bases for Dr. Jenkins’s causation opinion are therefore reduced to the following: (1) the Dow MSDS from which Dr. Jenkins could have gleaned that the contents of the drum were irritating to the lungs at some level of exposure; and (2) the relatively short time between Moore’s exposure to the chemicals and the onset of his breathing difficulty.
The district court was entitled to find that the Dow MSDS had limited value to Dr. Jenkins. First, Dr. Jenkins admitted that he did not know what tests Dow had conducted in generating the MSDS. Second, and perhaps more importantly, Dr. Jenkins had no information on the level of exposure necessary for a person to sustain the injuries about which the MSDS warned. The MSDS made it clear that the effects of exposure to Toluene depended on the concentration and length of exposure.
The district court was also correct in viewing with skepticism Dr. Jenkins’s reliance on the temporal proximity between the exposure and injury. Cavallo v. Star Enter., 892 F.Supp. 756 (E.D.Va.1995), aff'd. in part, 100 F.3d 1150 (4th Cir.1996), contains a helpful discussion of this issue. In that case, the plaintiff alleged that she suffered respiratory illness as a result of exposure to aviation jet fuel vapors. The proffered expert relied substantially on the temporal proximity between exposure and symptoms. The court concluded that this reliance was “not supported by appropriate validation” as required by Daubert, and was “ultimately unreliable.” 892 F.Supp. at 773. The court observed that although “there may be instances where the temporal connection between exposure to a given chemical and subsequent injury is so compelling as to dispense with the need for reliance on standard methods of toxicology,” this was not such a ease. Id. at 773-74. The court pointed out that the plaintiff in Cavallo was not doused with jet fuel and that there was no mass exposure of jet fuel to many people who in turn suffered similar symptoms. In the absence of an established scientific connection between exposure and illness, or compelling circumstances such as those discussed in Cavallo, the temporal connection between exposure to chemicals and an onset of symptoms, standing alone, is entitled to little weight in determining causation.[9]
Dr. Jenkins offered no scientific support for his general theory that exposure to Toluene solution at any level would cause RADS. Because he had no accurate information on the level of Moore’s exposure to the fumes, Dr. Jenkins necessarily had no support for the theory that the level of chemicals to which Moore was exposed caused RADS.[10] Dr. Jenkins made no attempt to explain his conclusion by asserting that the Toluene so *279 lution had properties similar to another chemical exposure to which RADS had been scientifically linked. Several post-Daubert cases have cautioned about leaping from an accepted scientific premise to an unsupported one. See Wheat v. Pfizer, Inc., 31 F.3d 340, 343 (5th Cir.1994); see also Braun v. Lorillard Inc., 84 F.3d 230, 235 (7th Cir.1996); Daubert, 43 F.3d at 1319; Cavallo, 892 F.Supp. at 769. To support a conclusion based on such reasoning, the extrapolation or leap from one chemical to another must be reasonable and scientifically valid. See Daubert, 43 F.3d at 1319-20; Cavallo, 892 F.Supp. at 769.
In the end, Dr. Jenkins was relegated to his fall-back position that any irritant to the lungs could cause RADS in a susceptible patient. Dr. Jenkins cited no scientific support for this theory. None of Daubert’s factors to assess whether the opinion was based on sound scientific principles was met. Dr. Jenkins’s theory had not been tested; the theory had not been subjected to peer review or publication; the potential rate of error had not been determined or applied; and the theory had not been generally accepted in the scientific community. In sum, Dr. Jenkins could cite no scientific support for his conclusion that exposure to any irritant at unknown levels triggers this asthmatic-type condition. Under the Daubert regime, trial courts are encouraged to exclude such speculative testimony as lacking any scientific validity.
The district court was also entitled to conclude that Moore’s personal habits and medical history made Dr. Jenkins’s theory even more unreliable. Moore had been a moderate to heavy smoker for twenty years. In addition, he had just recovered from pneumonia shortly before his contact with the chemicals. Finally, Moore had suffered from asthma (a condition very similar to RADS) in his youth.
In sum, the district court did not abuse its discretion in finding that the “analytical gap” between Dr. Jenkins’s causation opinion and the scientific knowledge and available data advanced to support that opinion was too wide. The district court was entitled to conclude that Dr. Jenkins’s causation opinion was not based on scientific knowledge that would assist the trier of fact as required by Rule 702 of the Federal Rules of Evidence.
CONCLUSION
Daubert and its progeny give the district court discretion to “keep the gate” for the purpose of admitting or excluding opinion testimony. In this ease, the district court did not abuse that discretion in concluding that the causation evidence proffered by Dr. Jenkins should be excluded. It was within the judge’s discretion to conclude that Dr. Jenkins’s testimony was not grounded in science as required by Daubert and its progeny, and, therefore, was not sufficiently reliable for the jury to consider. We therefore affirm the judgment of the district court.
AFFIRMED.
KING, Circuit Judge, concurs in the result reached by the majority.

. The MSDS provided, in pari, as follows:
MATL NAME: DOW CORNING(R) 1-2531 RELEASE COATING
SECTION II — HAZARDOUS INGREDIENTS AS DEFINED IN 29 CFR 1910.1200 ... TOLUENE ...
SOLVENT NAPHTHA, PETROLEUM, LIGHT ALIPHATIC ...
ISOBUTYLISOBUTYRATE PROPYLENE GLYCOL METHYL ETHER ...
SECTION III — EFFECTS OF OVEREXPOSURE
*272 INHALATION: SHORT VAPOR EXPOSURE MAY CAUSE DROWSINESS AND IRRITATE NOSE AND THROAT. VAPORS MAY INJURE BLOOD, LIVER, LUNGS, KIDNEYS, AND NERVOUS SYSTEM. DEGREE OF EFFECTS DEPENDS ON CONCENTRATION AND LENGTH OF EXPOSURE. COMMENTS: PROLONGED TOLUENE OVEREXPOSURE MAY INJURE BLOOD, LIVER, LUNGS, KIDNEYS, AND NERVOUS SYSTEM AND MAY AGGRAVATE EXISTING EYE, SKIN, AND RESPIRATORY DISORDERS.

. The Defendants agree that Dr. Jenkins’s qualifications are outstanding. He served residencies in internal medicine, tuberculosis, and chest disease and allergy, and was certified by the American Board of Internal Medicine in 1947. After serving as Chief Resident in Medicine and Assistant Professor of Medicine and Physician in Charge of the Tuberculosis and Chest Unit at the University of Michigan Medical School from 1943 to 1947, he spent forty-four years on the faculty at Baylor Medical School. In 1991, he went into practice in Houston with a group of physicians specializing in respiratory ailments.

. Stuart M. Brooks, M.D. et ah, Reactive Airways Dysfunction Syndrome (RADS), 88 Chest 376 (1985).

. Frye v. United Stales, 293 F. 1013 (D.C.Cir.1923).

. Fed.R.Evid. 702 provides:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

. The panel majority took the position that because Dr. Jenkins's causation opinion was not predicated on "hard science,” it was therefore not subject to Daubert's standards for admissibility. We disagree. Daubert and Joiner both involved questions of medical causation. As one of the scientists who filed an amicus brief, Professor Alvan R. Feinstein, stated: "In other words, determining the etiology of a disease — its cause— involves the same scientific exercise, whether the decision is made by a clinician, an epidemiologist, or other scientist.” Brief of Dr. Feinstein, Sterling Professor of Medicine and Epidemiology at the Yale University School of Medicine and author and co-author of more than 375 peer-reviewed articles and five scientific texts, including Clinical Judgment.
In any • event, in this Circuit an opinion is governed by Fed.R.Evid. 702 and Daubert, even though the opinion is not grounded in "hard science,” assuming such a distinction exists. In Watkins v. Telsmith, Inc., 121 F.3d 984 (5th Cir.1997), we rejected the position that application of the Daubert factors is unwarranted in cases where expert testimony is based solely on experience or training. Id. at 988-90.

. Fed.R.Evid. 104(a) provides:
Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (b).

. This analysis by the Supreme Court is particularly relevant to our case. The Brooks study relied upon by Dr. Jenkins suffered from the same self-doubts as the studies in Joiner. Dr. Brooks was unable to reach any conclusions based on his isolated studies. '

. See also Porter v. Whitehall Labs., Inc., 9 F.3d 607 (7th Cir.1993); 2 Stephen A. Saltzburg et al„ Federal Rules of Evidence Manual 1233-34 (7th ed.1998).

. Given the paucity of facts Dr. Jenkins had available about the level of Moore's exposure to the Toluene solution, his causation opinion would have been suspect even if he had scientific support for the position that the Toluene solution could cause RADS in a worker exposed to some minor level of the solution. Under Daubert, "any step that renders the analysis unreliable ... renders the expert's testimony inadmissible. This is true whether the step completely changes a reliable methodology or merely misapplies that methodology." In re Paoli R.R. Yard PCB Litigation, 35 F.3d 717, 745 (3d Cir.1994) (emphasis in original).