Frank GREER, Plaintiff,

v.

BUNGE CORPORATION, Defendant.

No. 3:97–cv–558WS.

United States District Court, S.D. Mississippi, Southern Division.

May 4, 1999.

Shane F. Langston, Langston, Frazer, Sweet & Freese, Jackson, MS, Bobby Ray Long, Brenda Carol Greer Cameron, Mississippi State Tax Commission, Jackson, MS, for Frank E. Greer, plaintiff.

Frank S. Thackston, Jr., Lake Tindall, LLP, Greenville, MS, for Bunge Corporation, defendant.

## ORDER

WINGATE, District Judge.

Before the court is defendant's motion to exclude the expected expert testimony of plaintiff's witness, Dr. R.L. Rollins, Jr., a veterinarian who is prepared to opine on the causal relationship between the presence of aflatoxin in corn feed allegedly sold by defendant to plaintiff and the death, illness, infertility and milk-producing inability of plaintiff's dairy cattle. Defendant argues that Rollins' proposed testimony fails to meet the standards promulgated by the United States Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and its progeny. Plaintiff opposes the motion; however, for the rea-sons which follow, this court is persuaded to grant the motion.

In *Daubert,* the United States Supreme Court set out the criteria district courts are to follow in assessing challenged expert testimony offered under Federal Rules of Evidence 702. The Court stated that:

> Proposed testimony must be supported by appropriate validation—i.e., "good grounds," based on what is known ... [T]he requirement that an expert's testimony pertained to "scientific knowledge" establishes a standard of evidentiary reliability. (footnote omitted) *Daubert,* 509 U.S. at 590, 113 S.Ct. at 2795.

Accordingly, the United States Supreme Court then held that a trial court has a duty to screen expert testimony for both its relevance and reliability. *Id.* An expert's opinion must have a "reliable basis in the knowledge and experience of his discipline." *Id.* at 592, 113 S.Ct. at 2796. Specifically, the Court must determine that the reasoning and methodology underlying the testimony is scientifically valid and that the reasoning and methodology can properly be applied to the facts in issue. *Id.* at 592–93, 113 S.Ct. at 2796. Thus, said the Court, under Rule 703, an expert must base his opinion on facts and data of a type reasonably relied on by experts in the field. *Id.* at 595, 113 S.Ct. at 2789–98.

So, "whether an expert's testimony is based on 'scientific technical or other specialized knowledge,' *Daubert* and Rule 702 demand that the district court evaluate the methods, analysis, and principles relied upon in reaching the opinion. The court should ensure that the opinion comports with applicable professional standards outside the courtroom and that it 'will have a reliable basis in the knowledge and experience of [the] discipline.' 509 U.S. at 592, 113 S.Ct. at 2796." *Watkins v. Telsmith, Inc.,* 121 F.3d 984, 991 (5th Cir.1997).

*Daubert* also instructs the trial court on the procedural mechanics for resolving dis-

putes relative to the expert's competence to testify under the standards enunciated by *Daubert.* *Daubert* directs that the district court determine admissibility under Rule 702 by following the directions provided in Rule 104(a). Federal Rule of Evidence 104(a) provides that preliminary questions concerning the qualifications of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (b). So, Rule 104(a) requires the trial judge to conduct a preliminary fact-finding and to make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert,* 509 U.S. at 592–93, 113 S.Ct. at 2796.

The party sponsoring the expert testimony has the burden of showing that the expert's findings and conclusions are based on the scientific method and, therefore, are reliable. "This requires some objective, independent validation of the expert's methodology. The expert's assurances that he has utilized generally accepted scientific methodology is insufficient." *Moore v. Ashland Chemical, Inc.,* 151 F.3d 269, 276 (5th Cir.1998). "The proponent need not prove to the judge that the expert's opinion is correct, but [he] must prove by a preponderance of the evidence that the testimony is reliable." *Id.*

In seeking to perform its role as the juridical gatekeeper as envisioned by *Daubert,* this court conducted a preliminary fact-finding session during which the court heard the testimony of Dr. Rollins outside the presence of the jury. Dr. Rollins is a Doctor of Veterinary Medicine. The defendant does not question his expertise as a veterinarian; instead, the defendant questions Dr. Rollins' methodology in arriving at his ultimate conclusion that plaintiff's dairy cattle were infected by aflatoxin poison.

Aflatoxins represent a unique group of potentially dangerous poisons that are produced by the widespread occurrence of Aspergillus molds. These poisons belong to a large family consisting of structurally diverse by-products of mold-growth known as mycotoxins. Not all molds produce mycotoxins and of those that do, many do not produce mycotoxins under all conditions. Four aflatoxins commonly occur in grains, including corn, namely, aflatoxins B–1, B–2, G–1, and G–2, but these four aflatoxins do not possess the same toxic potency to animals. Supposedly, aflatoxins B–1 and G–1 are more potent than B–2 and G–2. Molds can form and grow in corn at any stage from pre-harvest to the time the corn is consumed. Odor in corn may or may not be an indication of mold growth since the presence of odor in a quantity of corn is not a scientifically valid indication. Similarly, a "black light" examination of a sample of corn for sparkling luminescence may or may not confirm the presence of aflatoxin since a black light examination can result in both false positive and false negative detection of aflatoxin. The scientifically accepted method for determining whether a particular quantity of corn does or does not contain aflatoxin and, if so, the level of concentration that is present in such corn, is to procure and chemically analyze a representative sample of such corn or, alternatively, procure and chemically analyze a representative sample of the milk excreted by cows that consume such corn.

So, the parties all agree that aflatoxin poisoning, aflatoxicosis, may be detected by appropriate tests upon either the blood, urine, tissue or milk of dairy cattle. The parties also agree that the presence of aflatoxin in corn feed initially may be indicated by a black light (fluorescent) test and confirmed by specific lab tests. The parties also agree that the United States Food and Drug Administration regulates what quantity of B–1 aflatoxin may be present in milk, an action level of 0.5 ppb, and what quantity of aflatoxin may be present in dairy cattle feed, 20 ppb. Ap-

parently, the United States Food and Drug Administration distinguishes among the various aflatoxins and regulates only the B–1 variety. The parties further agree that aflatoxins can harm dairy cattle; however, the parties disagree on how concentrated the exposure need be and how long the duration of exposure need be.

Dr. Rollins is prepared to tell the jury that in his opinion plaintiff's troubles with his dairy cattle herd were caused by aflatoxicosis. Plaintiff claims that after he fed his herd feed corn purchased by him from defendant Bunge Corporation that his cattle became ill, many died, many failed to conceive, many lost their offspring and plaintiff's milk production decreased significantly. Plaintiff agrees that he last purchased Bunge corn on July 12, 1994, and last fed Bunge corn to his dairy cattle on August 8, 1994.

According to Dr. Rollins, he based his opinion upon his experience as a veterinarian and upon certain laboratory reports, namely, an August 26, 1994, report from the Mississippi State Chemical Laboratory indicating the presence of aflatoxin in a milk sample submitted by plaintiff on August 23, 1994; an autopsy report of December, 1994, performed on two of plaintiff's dairy cattle; and the October 26, 1994, report from Romer Labs, Inc.

This court is not persuaded that Rollins' methodology in reaching his conclusion passes the *Daubert* test. Dr. Rollins testified that after observing the cattle on more than one occasion, he noted that their symptoms indicated aflatoxicosis. Dr. Rollins acknowledges that he did not order any blood tests, urine tests or tissue tests. Further, he acknowledges that the symptoms he observed are common to other cattle illnesses. While he says he relied upon the autopsy report of two slain cattle for that purpose, he admits that the autopsy reports failed to show that the cattle suffered from pneumonia and failed to show that the cattle suffered from aflatoxicosis. Then, there is the August 26 report from the Mississippi State Chemical Laboratory showing .09 m–1 ppb aflatoxin present in a milk sample. Dr. Rollins is unable to make a connection between this slight level of aflatoxin in the milk sample (an amount not proscribed by the United States Food and Drug Administration) and the amount of aflatoxin that was in the feed fed to the cow producing this milk. Further, Dr. Rollins is unable to state within the realms of scientifically accepted data what concentration of aflatoxin in corn feed fed to dairy cattle over what period of time would cause the harm to dairy cattle about which plaintiff complains. Dr. Rollins acknowledged that he did not know what measure of concentration would cause harm, only that he believes that any amount of aflatoxin would hurt. He does not clothe his naked opinion with any scientific literature. The United States Food and Drug Administration in its regulation of aflatoxin in milk proscribes any presence of aflatoxin in excess of 0.5 ppb. This prohibition governs the integrity of milk, but does not speak to that quantity which would cause dairy cattle to become ill, infertile, and die.

Dr. Rollins' reliance upon the October 26 Romer report suffers from the same infirmity. That report purports to show that the corn sample submitted contained aflatoxin. Defendant contends that the corn sample was not representative. Even so, the report contains nothing to undergird Dr. Rollins' ultimate opinion. The report shows a corn sample submitted by plaintiff to contain B–1 aflatoxin in the amount of 280 ppb and 13 ppb of aflatoxin B–2. The report also shows that 2.7 ppm fumonisin B–1 was detected. This report does not state and Rollins' testimony does not establish whether this level of aflatoxin was consumed by plaintiff's cattle or even when this level of aflatoxin occurred. As acknowledged by all parties herein, plaintiff's cows ceased to eat dairy concentrate containing Bunge corn on August 8, 1994. The Romer report of October 26, 1994, shows the concentrate level as of the date the corn was tested. Dr. Rollins is unable

to make a connect between this test date and the date the plaintiff's cattle last consumed Bunge corn. Moreover, Dr. Rollins' analysis thoroughly ignores testimony that plaintiff's cattle were fed a mix of grains along with the Bunge corn. Defendant and its experts maintain that a grain "mix" would affect the potency of any aflatoxins present and that this "mix" must be factored into any expert's opinion on toxicity. Dr. Rollins' testimony, structured as it is upon the assertion that any amount of aflatoxin present in corn would harm dairy cattle, simply ignores this consideration.

In challenging Dr. Rollins' methodology, the defendant has presented the live and affidavit testimony of three experts who all challenge Dr. Rollins' ability to diagnose dairy cattle as suffering from aflatoxicosis by an observation of symptoms. These experts, Dr. John C. Reagor, a toxicologist who is Head of the Department of Toxicology, Texas Veterinary Diagnostic Laboratory and Professor in the Department of Veterinary Anatomy and Public Health, College of Veterinary Medicine, Texas A & M University; Dr. Steven S. Nicholson, a veterinary toxicologist employed by the Louisiana Cooperative Extension Service and Associate Professor in the Louisiana State University School of Veterinary Medicine; and Dr. Timothy D. Phillips, a toxicologist who is Chair and Professor of Toxicology at Texas A & M University, all state that appropriate scientific methodology requires an analysis of blood, urine, or tissue. Further, these experts opine that in order to determine whether the presence of aflatoxins in milk may harm dairy cattle, one must know the concentration of the aflatoxin in feed and the duration over which the dairy cattle consumed the feed.

*Daubert* and its progeny establish the district courts as gatekeepers for the purpose of admitting or excluding opinion testimony. This court simply is unpersuaded that Dr. Rollins' testimony is based upon appropriate scientific methodology as commanded by *Daubert*. Therefore, this court

hereby grants defendant's motion to exclude the testimony of Dr. R.L. Rollins, Jr.

**SO ORDERED AND ADJUDGED.**