RHESA HAWKINS BARKSDALE, Circuit Judge,
dissenting in part:
Although I agree with the majority that the St. Martins are not entitled to damages for the period prior to their acquisition of the property, I must dissent, most respectfully, from the imposition of any liability. I do so because: the district court abused its discretion in permitting Dr. Chabreck to give expert testimony that barge bow waves entering the marsh through the few gaps in the spoil banks provide sufficient force to erode the vegetative mat; and the servitude agreement does not impose a duty to maintain those spoil banks. (I do not address the St. Martins’ other claimed liability-bases; they were not reached by either the district court or the majority.)
I.
An additional recitation of pertinent facts is necessary. The canals are only 7000 feet long (approximately 1.33 miles). In the spoil banks, there are only approximately six gaps (each approximately 10 to 15 feet wide).
The canals were dug in the 1960s, pursuant to a servitude agreement granting Superior the right to deposit spoil, created by dredging the canals, within 150 feet of each side of the canals’ banks. Most importantly, the agreement does not mention-much less require — Appellants to construct a levee system for the canals. In fact, pursuant to the agreement, the canals were to cause as little interference as possible with drainage.
Two other companies’ pipelines cross the spoil banks at gaps; those gaps are larger than the ones at issue. In addition, during the lengthy time period (more than 25 years) between the canals’ construction and the St. Martins’ purchase in 1992, their predecessor in interest, Southdown Sugars, Inc., did not complain about the spoil banks’ maintenance.
II.
A.
In determining whether expert testimony is admissible, the district court “must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable”. Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). It is relevant when it relates to any issue in the case, id. at 591, 113 S.Ct. 2786; reliable, when “grounded in the methods and procedures of science and ... more than unsupported speculation or subjective belief’. Curtis v. M&S Petroleum, Inc., 174 F.3d 661, 668 (5th Cir.1999). A district court abuses its discretion if it admits expert testimony that is not relevant and reliable. See Kumho Tire Co. v. Carmichael, 526 U.S. 137, 145, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). Pursuant to this standard of review, the court abused its discretion in admitting Dr. Chabreck’s testimony.
1.
District courts must be assured that the proffered witness is qualified to testify by virtue of his “knowledge, skill, experience, training, or education”. Fed. R. Evid. 702. A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject.
Wilson v. Woods, 163 F.3d 935, 937 (5th Cir.1999).
A key issue is whether Dr. Chabreck is qualified to testify as an expert on whether barges’ bow waves, moving from the Intra- *413 coastal Waterway into the canals, and then passing through the spoil bank gaps, provide sufficient force to- erode the vegetative mat. The following trial colloquy delineates Dr. Chabreck’s theory:
[Attorney for Mobile Your theory of causation ... is that barge induced waves enter cuts that have somehow formed over the years in the ... canals, and that hydrologic force has been exerted on the mat, to a degree necessary or sufficient to erode that mat, is that correct?
[Dr. Chabreck:] That’s correct, sir.
[Attorney for Mobili] Okay. Now, that force that is applied, that erosive action, ... is studied by scientists known as hydrologists, is that correct?
[Dr. Chabreck:] That’s correct.
(Emphasis added.)
Testimony concerning whether the waves have sufficient force to erode the vegetative mat should be by a hydrologist; Dr. Chabreck’s testimony supports this. In fact, he admitted at trial he would defer to a hydrologist on these matters.
Dr. Chabreck, who has a B.S. in Forestry, an M.S. in Wildlife, and a Ph.D. in Botany, is a Professor of Wildlife at Louisiana State University; has worked for the U.S. Fish and Wildlife Service as a Wildlife Biologist and Assistant Secretary; and has published more than 130 articles in popular and scientific journals. (His resume does not delineate how many of these articles are relevant to floatant marsh damage.) He is certified as a wetland scientist by the Society of Wetland Scientists and as a professional wildlife biologist by the National Orgánization of the Wildlife Society. His resume states he has extensively studied marsh ecology, wetlands management, and wetland restoration. Obviously, this is a most impressive resume, if coastal marsh management is at issue. But, it does not demonstrate expertise in hydrology — the primary subject at hand.
On cross-examination, Dr. Chabreck admitted: he took no hydrology courses in obtaining his degrees; and his only formal training in hydrology is from courses that might touch on water pressure, water management, and water chemistry. His work experience has involved wetlands management, mostly in Southwestern Louisiana; and he has been involved in wildlife management and marsh research. This does not translate into the requisite expertise in hydrology.
Therefore, Dr. Chabreck is not qualified to render expert testimony on: hydrologic forces generated by the . bow waves of barges in the Intracoastal Waterway; what forces the waves create when they enter the spoil bank gaps; what force is present when the waves reach the vegetative mat; or whether this force is sufficient to cause erosion of the mat.
Concerning hydrology, Dr. Chabreck is not qualified as an expert by education; his emphasis is wildlife. Nor is he qualified by knowledge, skill, experience, or training; his focus is on marsh wildlife management and restoration, not hydrology. True, in order to restore marsh damage, he has to have some degree of knowledge regarding what causes it; but, as demonstrated by his restoration plan to create an attached marsh (the vegetation is attached to the soil rather than floating on top of several feet of water), this does not necessarily apply to a floatant marsh. Therefore, in the light of Rule 702’s requirements, he is not qualified to render expert testimony on hydrologic forces exerted on the vegetative mat, resulting from waves caused by barges in the Intracoastal Waterway.
2.
Even assuming Dr. Chabreck is qualified to give expert testimony on this matter, the opinion he rendered does not meet Daubert’s requirements. There, the Court developed
a five-factor, non-exclusive, flexible test for district courts to consider when as *414 sessing whether the methodology is scientifically valid or reliable. These factors include: (1) whether the expert’s theory can be or has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error of a technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) the degree to which the technique or theory has been generally accepted in the scientific community.
Moore v. Ashland Chemical, Inc., 151 F.3d 269, 275 (5th Cir.1998)(en banc).
Dr. Chabreck testified: he had not published any articles on boat-induced waves causing vegetative mat loss; he did not know of any scientific study that would support his theory; he had not tested his theory in this, or any other marsh; and, although it is possible to measure the force and volume of water moving through the gaps, he had not done so.
Because the theory has not been published, or even tested, it could not possibly have been subject to peer review; there is no known error rate; and it cannot be generally accepted in the scientific community. Accordingly, because this testimony does not meet any of the Daubert factors, the district court abused its discretion in admitting it.
Dr. Chabreck’s testimony was the St. Martins’ only causation evidence; without it, the district court could not find that waves entering the marsh through the spoil bank gaps caused the damage. This is especially so in the light of the testimony presented by the hydrologist called by Appellants: the force of the waves on reaching the vegetative mat was so small that “a normal afternoon wind would exert more force”.
B.
But, even if the testimony was admissible, there is no duty on the part of Appellants to maintain the spoil banks. One servitude agreement’states:
NOW, THEREFORE, in consideration of the enhancement in value of Grantor’s above-described lands in the event that a well or wells are drilled thereon, Grantor does hereby convey to Superior, its successors and assigns, the right and servitude to dredge, construct, maintain and use a canal having a width of 65 feet.... Grantee is also given the right to deposit spoils within a distance of 150 feet on each side of the banks of the canal, but shall do so in such manner as to cause as little interference as possible to drainage....
This grant is for the purpose of affording access to the above described lands....
(Emphasis added.) (The other servitude agreement differs only in the property description.)
The servitude agreement imposes a duty to maintain the canals, which are limited to a width of 65 feet. Spoil is the matter dredged to create a canal. The agreement authorizes depositing spoil within 150 feet on each side of the canals’ banks. Restated, the spoil may be deposited away from the bank of a canal, so long as it is not deposited more than 150 feet' from it. The agreement does not provide for Appellants to maintain the spoil banks. In short, the spoil banks are simply not part of the canals.
The plain language of the agreement does not require Appellants to construct and maintain a levee system. (The St. Martins want even more than that; they want the canals bulkheaded.) The servitude agreement prevents such construction, because it authorizes a canal 65 feet wide, defines its centerline, and does not grant additional land on which to construct a levee.
Moreover, the agreement requires that the spoil banks interfere as little as possible with drainage. It is well to remember that the property was a marsh prior to *415 dredging the canals. Constructing a levee system would isolate the marsh and block drainage. In other words, constructing levees is not interfering as “little ... as possible [with] drainage”, as mandated by the servitude agreement: it is just the opposite.
Moreover, to “maintain” is defined as “[t]o care for (property) for purposes of operation productivity”. Blaok’s Law DictionaRY 965 (7th ed.1999). To “maintain a canal”, a man-made waterway used operationally for access to wells drilled on the property, is to keep it navigable. That is a far cry from maintaining spoil banks created as a result of dredging the canals.
In short, the servitude agreement does not explicitly require Appellants to maintain the spoil banks. But, the district court found an implied obligation for them to do so, in the light of the requirement to maintain the canals. Without explaining why, the majority agrees with this construction.
As discussed, this obligation is not in the agreement’s plain language and does not comport with the dictionary definition of “maintain”. In the alternative, for “interpreting controversial clauses in a contract!,] the court is guided by the interpretation the parties themselves placed upon the agreement and their understanding of it as shown by their actions. Thus, the conduct of the parties is relevant in determining their common intent”. Cashio v. Shoriak, 481 So.2d 1013, 1016 (La.1986) (citations omitted).
The canals were created in 1965. South-down did not demand that Superior, or its assignee Mobil, maintain the spoil banks. The gaps were present in the 1973 aerial photograph of the property. Over 25 years after the canals were dredged, and approximately 20 years after evidence of gaps being present, the St. Martins requested that the spoil banks be maintained. Obviously, the course of conduct by the original parties, Southdown and Superior, demonstrates that they certainly did not intend for the spoil banks to be maintained. Cf. id. (over seven-year period of parties’ acquiescence in political yard signs indicates they did not intend to proscribe such signs, even though plain language would have barred them).
III.
For the foregoing reasons, the district court abused its discretion in admitting Dr. Chabreck’s testimony and reversibly erred in concluding that, under the servitude agreement, there is an implied obligation to maintain the spoil banks. Accordingly, I respectfully dissent.