IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

No. 97-60416

FRANK TANNER, Individually, and as Father
and Next Best Friend of Jennifer Renee Tanner, Minor;
DAISY TANNER, Individually;
JENNIFER RENEE TANNER, Minor

                                        Plaintiffs-Appellees,

                        versus

H. WADE WESTBROOK, M.D. ET AL.

                                        Defendants

BAPTIST MEMORIAL HOSPITAL - DESOTO INC.,
A Delaware Corporation

                                        Defendants-Appellants

Appeal from the United States District Court
for the Northern District of Mississippi

April 27, 1999

Before HIGGINBOTHAM, JONES, and WIENER, Circuit Judges.

HIGGINBOTHAM, Circuit Judge:

This complex medical malpractice case stems from the tragic circumstances surrounding the birth of Jennifer Tanner, a young girl who now suffers from cerebral palsy. Jennifer's father, Frank Tanner, individually and as next friend of his daughter, and Daisy Tanner, Jennifer's mother, alleged various acts of negligence in this diversity action against their obstetrician, Dr. Wade Westbrook; their pediatrician, Dr. Manoj Narayanan; and the

hospital where Jennifer was born, Baptist Memorial Hospital-Desoto, Inc. The jury returned a verdict in favor of the Tanners against Dr. Westbrook and BMH. On appeal, we vacate the judgment and remand for a new trial due to the erroneous admission of expert testimony at trial.

I

Daisy Tanner was admitted to BMH in labor at 9:50 a.m., on August 29, 1993. Mrs. Tanner's labor progressed normally throughout the day, but, at 11:25 p.m., the baby's fetal heart tracing became abnormal. The attending nurse was unable to apply a fetal scalp electrode to properly monitor the baby's heart rate between this period and Jennifer's birth. Dr. Westbrook delivered Jennifer at 12:03 a.m. Jennifer was not breathing at birth, so Dr. Westbrook and the delivery staff nurses tried to resuscitate her with an oxygen mask and then by endotracheal tube. Jennifer began to breathe on her own at approximately 12:30 a.m. At 12:45 a.m., Jennifer was taken to the newborn nursery, and, at approximately this time, Dr. Narayanan was called to attend to Jennifer. Dr. Narayanan arrived at approximately 1:30 a.m.

The Tanners urged at trial that between 12:45 a.m. and 1:30 a.m., when Dr. Narayanan arrived, Jennifer was left untreated in the nursery despite her precarious condition. Dr. Westbrook conceded that he did not actively monitor Jennifer while she was in the nursery. According to the Tanners, a nurse's physical

2

examination of Jennifer during this time revealed respiratory distress and possible seizure activity.

A blood gas test completed at 1:55 a.m., after Dr. Narayanan had arrived, indicated the presence of acute severe metabolic acidosis. Acidosis is caused by a build-up of lactic acid in the bloodstream that results from diminished tissue oxygenation. Dr. Narayanan ordered more tests and directed that sodium bicarbonate be given to Jennifer to help correct the acidosis. The sodium bicarbonate was administered at 2:45 a.m. and completed at 3:15 a.m. Afterwards, Jennifer's respiration improved.

At 11:55 a.m., however, Jennifer began to have seizures and was transferred to LeBonheur Neonatal Intensive Care in Memphis, Tennessee, for further treatment. Jennifer was later diagnosed with cerebral palsy.

II

The Tanners filed this suit, alleging that Drs. Westbrook and Narayanan and BMH were negligent in their treatment of Jennifer and that their negligence proximately caused or contributed to her resulting cerebral palsy. At trial, both sides provided conflicting theories regarding the cause of Jennifer Tanner's cerebral palsy and whether the defendants could have done more to prevent it. The jury, assigning liability to Dr. Westbrook and BMH equally, but exonerating Dr. Narayanan, returned a verdict of

$3,000,000 in favor of Jennifer Tanner and $100,000 in favor of each parent.  Only BMH has prosecuted this appeal.

### III

BMH maintains that the trial court erred in admitting the Tanners' expert testimony regarding causation and that, had this testimony been properly excluded, the jury would not have held them liable.  Prior to trial, the defendants filed a motion for an FRE 104 hearing to exclude the testimony of two of the Tanners' experts – Drs. St. Amant and Nestrud – as failing to clear the hurdles of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).[1] The district court, making a preliminary assessment that *Daubert* review did not apply to the Tanners' experts, denied the motion and stated that it would "pass on the qualifications of the said witnesses at trial."  Thus, to trigger *Daubert* review of the experts' testimony, the defendants were tasked with renewing their objection to the testimony at trial.  Furthermore, to preserve error on the admissibility of the Tanners' experts' testimony, BMH had to object at trial.  *See Marceaux v. Conoco, Inc.*, 124 F.3d 730, 734 (5th Cir. 1997)(stating the general rule in this circuit

---

[1]*Daubert* requires that "when expert testimony is offered, the trial judge must perform a screening function to ensure that the expert's opinion is reliable and relevant to the facts at issue in the case."  *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 988-89 (5th Cir. 1997).

4

that an overruled motion in limine does not preserve error on appeal – objection at trial is still required).

We find that BMH preserved error on the admissibility issue by objecting at trial to Dr. Nestrud's opinion on causation. Near the beginning of Dr. Nestrud's testimony, the following exchange occurred:

> Q . . . . But based on your experience and training, and the literature you have read about this subject, do you have an opinion to a reasonable degree of medical certainty as to whether had Jennifer been properly resuscitated she more than likely, more than likely would have been normal?
>
> A  Yes.
>
> Mr. Dunbar:  I make an objection to that, Your Honor, for the record.  The foundation has not been laid that there is any scientific basis for that opinion beyond this gentleman's objective opinion on the point.
>
>  . . .
>
> THE COURT:  Very well.  The objection will be overruled.
>
> BY MR. TOLLISON:
>
> Q  Do you have an opinion?
>
> A  It is my opinion that a baby with an APGAR score of 3 with no other problems can be – can be fully resuscitated.

Dr. Nestrud went on explicitly to claim that birth asphyxia which began shortly before delivery led to Jennifer's cerebral palsy, and had the defendants followed proper procedures in treating the asphyxia, Jennifer "would not have had the brain damage that she has now."

In overruling the defendants' objection, and thus allowing Dr. Nestrud to espouse his views on the etiology of Jennifer's cerebral palsy and on whether different treatment would have allowed Jennifer Tanner to have a normal life, the district court effectively conducted a *Daubert* inquiry, presumably basing its conclusion on the arguments and scientific literature submitted in regard to the pretrial motion for an FRE 104 hearing. On the basis of these materials, the district court concluded that the expert testimony was relevant and reliable, and it admitted Dr. Nestrud's expert testimony.

*Daubert* inquiry was appropriate. *See Kumho Tire Co., Ltd. v. Carmichael*, 1999 WL 152455, at *9 (U.S. Mar. 23, 1999)(stating that when an expert's "testimony's factual basis, data, principles, methods, or their application are called sufficiently into question . . . , the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of the relevant discipline.'" (quoting *Daubert*, 509 U.S. at 592)). BMH, in its motion for an FRE 104 hearing, called the Tanners' experts' opinions on causation "sufficiently into question," *id.*, by providing conflicting medical literature and expert testimony. Further, that a component of the experts' testimony was based on their personal knowledge or experience does not exempt the experts' opinions from the rigors of *Daubert*. *See id.* (noting that "the

6

relevant reliability concerns may focus upon personal knowledge or experience").

We review the district court's admission of expert testimony for an abuse of discretion. *See Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 274 (5th Cir. 1998)(en banc). That is, "the discretion of the trial judge and his or her decision will not be disturbed on appeal unless manifestly erroneous." *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 988 (5th Cir. 1997)(internal quotation marks and citations omitted). If we find an abuse of discretion in admitting evidence, we review the error under the harmless error doctrine, affirming the judgment, unless the ruling affected substantial rights of the complaining party. *See* FED. R. EVID. 103(a); *United States v. Skipper*, 74 F.3d 608, 612 (5th Cir. 1996). In determining whether district courts have abused their discretion in admitting or excluding expert testimony, we ask whether the expert testimony meets or fails to meet the *Daubert* standard of admissibility. *See, e.g., Watkins*, 121 F.3d at 988. The "overarching subject [of a *Daubert* inquiry] is the scientific validity and thus the evidentiary relevance and reliability of the principles that underlie a proposed submission." *Id.* at 989.

We grant the trial court "the same kind of latitude in deciding how to test an expert's reliability, and to decide whether or when special briefing or other proceedings are needed to investigate reliability, as it enjoys when it decides whether or

not that expert's relevant testimony is reliable." *Kumho Tire Co., Ltd. v. Carmichael*, 1999 WL 152455, at *11 (U.S. Mar. 23, 1999). This case is unique in that the trial judge did not specify on what basis he decided to admit Dr. Nestrud's testimony. Thus, we proceed directly to consideration of whether the district court abused its discretion in admitting the testimony. *Cf. United States v. Nichols*, 1999 WL 107021 (10th Cir. Feb. 26, 1999)(stating that, in reviewing the denial of a *Daubert* evidentiary hearing, the appellate court required "a sufficiently developed record in order to allow a determination of whether the district court properly applied the relevant law"). In making this determination, we rely upon the materials the trial court had before it to judge Dr. Nestrud's reliability: submissions made to the district court by both sides in regard to BMH's motion for an FRE 104 hearing.

Our review of the admissibility issue is, of course, guided by *Daubert*, the cases applying it, and *Kumho Tire*. In *Daubert*, the Supreme Court provided a list of factors, such as testing, peer review, error rates, and acceptance of the opinion in the relevant scientific community, that a court may choose to use in determining the reliability of an expert's testimony. *See Daubert*, 509 U.S. at 593-94; *see also Kumho Tire*, 1999 WL 152455, at *9 (emphasizing that the list of factors was not exclusive and that the factors may not always apply to the testimony at issue). The test of reliability is flexible and bends according to the particular

8

circumstances of the testimony at issue.  *See Kumho Tire*, 1999 WL 152455, at \*9; *see also Black v. Food Lion, Inc.*, No. 97-11404, 1999 WL 173001, at \*4 (5th Cir. Mar. 30, 1999) (advising that courts should use the traditional *Daubert* factors as a starting point for evaluating proffered expert testimony).  Whatever the test employed, the objective is to ensure the reliability and relevance of the expert testimony.  *See id.*

"The proponent [of the expert testimony] need not prove to the judge that the expert's testimony is correct, but she must prove by a preponderance of the evidence that the testimony is reliable." *Moore*, 151 F.3d at 276.  The theory of the Tanners' case was that Jennifer Tanner's cerebral palsy was caused by birth asphyxia that the defendants improperly treated in the hours immediately following her birth.  The Tanners' experts, Drs. St. Amant and Nestrud, supported this theory at trial by stating generally that birth asphyxia is a cause of cerebral palsy.  The doctors made this statement based on their personal knowledge and training and supported it with medical literature.  The doctors also opined, based on their experience in the fields of obstetrics and neonatology, that Jennifer suffered from birth asphyxia and that, through proper treatment of this condition, Jennifer's cerebral palsy could have been avoided.

BMH, on the other hand, insists that the cerebral palsy-causing incident occurred some time before Jennifer Tanner was

9

born.  BMH asserts that the major insult suffered by Jennifer prior to her birth caused a difficult labor and delivery, during which, as a result of this difficulty, she suffered birth asphyxia.  That is, BMH agrees with the Tanners that Jennifer Tanner suffered from asphyxia at birth; BMH does not agree, however, that birth asphyxia or the hospital's treatment of it caused Jennifer Tanner's cerebral palsy.

BMH supported its theory by submitting with its motion for an FRE 104 hearing an expert's affidavit and scientific literature pointing out that Jennifer's condition is not indicative of cerebral palsy caused by birth asphyxia.  The medical literature states that birth asphyxia is rarely a cause of cerebral palsy and that a large proportion of cases of cerebral palsy remains unexplained. *See* Karin B. Nelson & Jonas H. Ellenperg, *Antecedents of Cerebral Palsy*, NEW ENGLAND J. MED., July 10, 1986, at 85-86.  The medical literature also indicates that when birth asphyxia is severe enough to cause cerebral palsy, there is usually evidence of corresponding major organ damage. *See* Richard L. Naeye et al., *Origins of Cerebral Palsy*, 143 AM. J. DISEASES CHILDREN 1160 (1989). The organ damage is caused by preferential perfusion, a phenomenon triggered by asphyxia in which there is a redistribution of blood flow, with increased flow to the head and heart and decreased flow to non-vital organs. *See* AVROY A. FANAROFF & RICHARD J. MARTIN, NEONATAL-PERINATAL MEDICINE (5th ed.).  Jennifer Tanner did not suffer from

major organ damage in conjunction with her cerebral palsy. Furthermore, the literature maintains that many of Jennifer's symptoms in the hours after her birth support the conclusion that she suffered from congenital defects which, rather than asphyxia, probably triggered her cerebral palsy. *See* Naeye et al., *supra*, at 1159. Moreover, one study specifically stated that "[a] failure of medical personnel to react to evidence of . . . asphyxia was followed by a greater-than-expected frequency of neonatal apnea and seizures, but not CP." *Id.*

In response to BMH's FRE 104 motion materials, the Tanners provided copies of their experts' deposition testimony and supporting medical literature. These materials addressed BMH's contention that Jennifer's cerebral palsy was likely caused by some congenital defect, rather than birth asphyxia. The affidavits of both Dr. St. Amant and Dr. Nestrud state that there was no evidence of a congenital defect and that, as a result, they eliminated that explanation for her resulting condition. The doctors also opined that the lack of damage to Jennifer's nonvital organs was "consistent with [their] opinions that most of Jennifer's asphyxial damage occurred following her birth, and not in utero . . . ." The Tanners, however, provided no medical literature supporting their experts' claims that Jennifer's symptoms – including the absence of nonvital organ damage – were consistent with their theory of causation. Further, in his deposition, Dr. Nestrud testified that

11

he was not aware of any genetic causes for Jennifer's cerebral palsy, but, in order to rule out genetic causes, "a good physical examination by a qualified physician" was necessary; Dr. Nestrud had neither conducted such an exam nor reviewed the results of such an exam when he testified at his deposition.

The trial judge could have correctly concluded, based on the FRE 104 motion materials, that Dr. Nestrud had sufficient expertise, based on his experience and training, to testify about the standard of care to be given to a baby suffering from asphyxia. His ability to testify reliably about the cause of Jennifer's cerebral palsy, however, hinges on the validity of his opinion linking the post-birth asphyxia to Jennifer Tanner's cerebral palsy – specifically the depth of his knowledge of a complicated, specialized medical subject matter. He has no background in studying the causes of cerebral palsy. He bases his opinion on causation in part upon articles which state that asphyxia causes cerebral palsy. This fact is not disputed. What is in dispute is whether it is more likely than not that a baby with Jennifer Tanner's symptoms developed cerebral palsy as a result of the hospital's negligent treatment of her birth asphyxia. "[T]he question before the trial court was specific, not general. The trial court had to decide whether this particular expert had sufficient specialized knowledge to assist the jurors in deciding the particular issues in this case." *Kumho Tire*, 1999 WL 152455,

at *13 (internal quotation marks and citations omitted).  Based on the materials before the trial judge, Dr. Nestrud did not have the kind of specialized knowledge required to testify regarding causation, nor did he rely upon medical literature directly addressing the causation issue in this case.  This deficiency rendered his expert testimony as to a critical issue in the case – causation – unreliable.  Thus, admitting the testimony, based on the materials submitted in support of its validity, was an abuse of discretion.

As we have explained, even though the court abused its discretion in admitting Dr. Nestrud's testimony, FRE 103(a) provides that courts of appeals should not reverse on the basis of erroneous evidentiary rulings unless a party's substantial rights are affected.  *See Munn v. Algee*, 924 F.2d 568, 573 (5th Cir. 1991).  This question is not susceptible to mechanical analysis; decisions are made on a case-by-case basis.  *See id.*  In this case, whether BMH's substantial rights were affected depends on whether the timing of BMH's objection to the expert testimony rendered the error harmless because the content of the inadmissible testimony had already been admitted without objection.  An error is harmless if the court is certain, after reviewing the record, that the error did not influence the jury or had only a slight effect on its verdict.  *See EEOC v. Manville Sales Corp.*, 27 F.3d 1089, 1094 (5th Cir. 1994).

13

Dr. Nestrud's testimony followed testimony by Dr. St. Amant, who also told the jury that birth asphyxia caused Jennifer Tanner's cerebral palsy and that, had the doctors treated her properly after birth, she "would have done better." In addition, directly prior to the objection to Dr. Nestrud's testimony, Dr. Nestrud had provided unsolicited testimony that Jennifer Tanner's chances for recovery were probably harmed by the defendants' allegedly lackluster resuscitation efforts.

Dr. St. Amant's prior testimony and Dr. Nestrud's limited comment prior to the objection do not dilute Dr. Nestrud's testimony to harmless error. Dr. Nestrud did not hedge. He testified that had the doctors acted properly, Jennifer would have been normal, a stronger conclusion than that reached by Dr. St. Amant – that Jennifer would have been "better." Moreover, in this complicated medical malpractice case containing complex issues of causation, if the court had excluded Dr. Nestrud's testimony, which, in greater detail than the testimony provided by Dr. St. Amant, put forth the Tanners' explanation for Jennifer Tanner's current condition, then the Tanners' case would have suffered markedly, and the jury may have reached a different verdict. We cannot conclude that the error was harmless. Indeed, whether Dr. St. Amant's testimony could, without the testimony of Dr. Nestrud, have supported the jury's finding of causation is a close call. Admitting the opinion of Dr. Nestrud affected BMH's substantial rights.

14

IV

We add a final word. This record lacks support for the reliability of Dr. Nestrud's opinion that birth asphyxia was more likely than not the cause of the child's cerebral palsy. Whether this weakness is a by-product of the absence of exploration of the *Daubert* issues at a pretrial hearing, we do not know. Nor do we know if his opinion is supportable. We say only that it was not supported in this record.

Because the district court abused its discretion in admitting Dr. Nestrud's testimony regarding causation, and because this error affected BMH's substantial rights, we vacate the judgment of the trial court and remand for a new trial consistent with this opinion.

VACATED and REMANDED for a new trial.