NO. 07-00-0239-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL C

JANUARY 3, 2002

_____

IN THE INTEREST OF CDK, JLK, and BJK, Minor Children

_____

FROM THE 223rd DISTRICT COURT OF GRAY COUNTY;

NO. 31,162; HON. LEE WATERS, PRESIDING

_____

Before QUINN, REAVIS and JOHNSON, JJ.

In this appeal, Marshall and Rose Keys (the Keys), challenge a trial court's judgment terminating their parental rights to their children, CDK, JLK, and BJK. So too has the attorney ad litem representing the children filed a notice of appeal contesting the termination. Three issues pend for our resolution. They involve 1) the legal and factual sufficiency of the evidence supporting termination, 2) the admission of expert testimony concerning the findings of an Abel Assessment conducted upon Marshall Keys, and 3) the admission into evidence of Marshall Keys' 1977 criminal conviction for sexually abusing a child, namely his daughter from a prior marriage. We reverse.

### *Background*

The Keys were married in 1987, and their children, CDK, JLK and BJK , were born in 1988, 1989 and 1991, respectively. Child Protective Services (CPS) became involved

with the family in 1991 and subsequently removed the children in November 1992. The purported reason for doing so involved physical abuse suffered by CDK and physical neglect experienced by the other two children.

Testimony reflected that both the Keys were unkempt and maintained a dirty house. The latter was in extreme disarray with trash strewn on the floor and roaches covering the floor, walls and ceiling. One witness spoke of how the walls appeared to be moving and how roaches crawled into her purse and fell from the ceiling onto her. This condition, as well as Rose's abuse of alcohol, were concerns to the various agencies which allegedly tried to assist the Keys.

Subsequently, in 1994, all three children were returned to the home. CPS along with other local agencies continued to provide services to the family. And, though the home environment improved, the improvement did not continue. The Keys unilaterally ceased giving one of their children needed medication, and all three youths began to exhibit inappropriate behavior. Instances of Rose's continued abuse of alcohol also were documented, and on one occasion her intoxication resulted in her leaving the children unsupervised while she lay unconscious at the home of her employer.

A petition for termination was filed wherein CPS alleged two grounds purportedly justifying such relief. Specifically, it alleged that the Keys had 1) knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered the physical or emotional well-being of the children and 2) engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered

2

the physical or emotional well-being of the children. TEX. FAM. CODE ANN. §161.001(D) & (E).

The termination proceedings against both parents were tried jointly. Evidence was introduced about the Keys' alcohol consumption, Rose's 1990 plea of guilty to a charge of driving while intoxicated, Marshall's 1977 conviction for sexual assault of a child, Rose's plea of guilty to injuring or endangering a child as result of CDK's injuries sustained in 1992, and JLK's propensity to engage in simulated sexual acts and masturbate in private and public venues. Upon hearing this and other evidence, the jury returned a verdict against the Keys terminating their parental rights *viz* the children.

### Issue One - Sufficiency of the Evidence

The Keys initially challenge both the legal and factual sufficiency of the evidence supporting the jury's verdict. We overrule the point for several reasons.

First, though the two appellants describe the applicable standard of review, their analysis or application of the standard consists of the following:

> In this case, acts of both Respondents too remote in time were allowed in and were highly prejudicial. There is little doubt that these kids are screwed up. The question is how did they get that way? [sic] These children have been in CPS care for many years where they were stuck in families as 'fifth wheels' for a major part of their life. The influence of other foster children and other 'disturbed' children they have been around has not been good for their physical or emotional well being and has caused some of the problems these children have encountered.

How the foregoing argument evinces a want of legally or factually sufficient evidence goes unexplained. Nor does the summary explain how nothing in the rather extensive evidentiary record before us supports the fact-finder's decision. Instead, the Keys merely

3

conclude that their acts were too remote in time, that the children are "screwed up," and that the CPS and others are responsible for the condition of CDK, JLK, and BJK. This does not satisfy the requirement of Rule 38.1(h) of the Texas Rules of Appellate Procedure. That rule not only requires an appellant to cite to pertinent legal authority and the record, TEX. R. APP. PROC. 38.1(h), but also provides the reviewing court with substantive analysis of his argument. *See Bullard v. State*, 891 S.W.2d 14, 15 (Tex. App.–Beaumont 1994, no pet.)(discussing the rule as applied to a constitutional issue). Because the Keys do not do so here, since they do not explain how the supposed remote acts, conduct of the CPS or influence of other children somehow rendered the verdict legally or factually insufficient, *see Raw Hide Oil & Gas, Inc. v. Maxus Exploration Co.,* 766 S.W.2d 264, 275-76 (Tex. App. – Amarillo 1988, writ denied) (describing the tests applicable to claims of legal and factual insufficiency), or why nothing in the record supports the verdict, they waived the point.

### *Admission of Abel Assessment*

Next, the Keys assert that the trial court erred in admitting purported expert evidence proffered by Richard Mack (Mack). The latter spoke about the administration of a test known as the Abel Assessment to Marshall Keys. The test purportedly evaluated Marshall Keys' propensity for sexual deviancy and the risk he posed to his children.

According to Mack, Marshall's "highest sexual interest is in adolescent males and the lowest . . . is in adult females . . . ." Such interests were "the opposite that [they]

4

should be for a standard heterosexual male-female relationship," continued Mack.[1] Moreover, a child twelve years of age, according to Mack, would be at a "significant" risk "because [Marshall's] sexual interest for that age, nine to thirteen, is only slightly less than the adolescent male."[2] So too did Mack state that Marshall had an "extremely high" male interest "along all age categories until you get to adulthood" and a "very strong sexual interest . . . to male children . . . and to female children as well but under the age of adolescence, pre-school or under thirteen . . . ." When asked, Mack further opined that 1) Marshall "has a problem with deviant sexual interest," 2) he (*i.e.* Mack) "would be very concerned about this level of deviant sexual interest," 3) to "put him [Marshall] in a situation where he has access to children and where he's not being treated . . . is to put him in a risky situation," and 4) "to have accessibility to kids and that high sexual deviance is to make everyone unsafe." Finally, based upon his interpretation of the Abel Assessment, the witness concluded by all but labeling Marshall a pedophile.[3]

The Keys secured a timely running or continuing objection to the foregoing testimony. Their complaint was founded upon Rule 702 of the Texas Rules of Evidence. Among other things, they believed that Mack's purported expert testimony was unreliable when tested against the standard resurrected by *E.I. du Pont de Nemours & Co. v.*

---

[1]The State offered no evidence indicating that Marshall Keys ever sexually assaulted a male child, adolescent or adult. He had, however, sexually assaulted his minor daughter in 1977.

[2]Mack defined an adolescent as a minor between the ages of 13 to 17.

[3]His words were: "[n]ow, if I'm not able to say that's pedophilic, I won't say its pedophilic, but it's not a situational offender . . . [t]hose are primary sexual interests."

5

*Robinson*, 923 S.W.2d 549 (Tex. 1995) and that the trial court's admission of same was reversible error. We agree and sustain the contention.

### *Applicable Authority*

To be admissible, expert testimony must be 1) uttered by a qualified individual, 2) relevant, and 3) based upon a reliable foundation. *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 499 (Tex. 2001). Though the question of whether these elements have been established lies within the trial court's discretion, *id.*, the party tendering the evidence bears the burden of establishing them. *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d at 557.

Additionally, and concerning the element of reliability, we have been told that the applicable test is flexible but nonetheless focuses "solely on the underlying principles and methodology, not on the conclusions they generate." *Id.* at 557. This obligates the proponent of the evidence to prove that the specific technique or methodology from which the expert derives his opinions "has been subjected to a rate of error analysis." *Id.* at 559. In other words, the methodology must have been subjected to testing to assess its legitimacy. So too must the proponent show that the theory at issue has been generally accepted by members of the relevant scientific community. *Id.* Moreover, it is not enough for the purported expert to merely state that the methodology has been accepted and is reliable. *Id.* at 559-60. Rather, the proponent must illustrate same through substantive evidence, *id.*, sufficient to allow the trial court to "evaluate the methods, analysis, and principles relied upon in reaching the opinion." *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 725-26 (Tex. 1998), *quoting*, *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 991

6

(5th Cir. 1997). And, while a myriad of factors have been mentioned as pertinent in assessing reliability, *see, E.I. du Pont de Memours & Co. v. Robinson*, 923 S.W.2d at 557 (listing six and stating that the list is not exclusive), common sense demands that the evidence proffered to show reliability include the actual methods and principles being debated. Indeed, a trial court can hardly determine if a supposed theory, methodology or principle is reliable if evidence of the particular theory, method, or principle is withheld from it. And, therein lies the problem at bar.

In describing the Abel Assessment, Mack mentions two components. They consist of a supposed "objective" aspect involving reaction time to sexually laced pictures and a subjective aspect involving self-analysis through the completion of a questionnaire. Also discussed is what the person administering the test does with it once it is completed by the subject; the raw data is sent to Dr. Abel in Atlanta, Georgia.[4] Mack then describes what he does with the information returned by Dr. Abel. Yet, the sum and substance of evidence describing what Dr. Abel does to the data he receives consists of Mack's testifying that the doctor applies some "formulas" to it and plots the results on graphs. This is of particular import because it is the sum of Abel's work which is then interpreted by individuals such as Mack to derive the subject's sexual deviancy and dangerousness via the "danger registry" and like concepts.

In short, of what the formulas applied by Abel consist, how they were derived, and whether they have ever been subjected to analysis or testing goes utterly unmentioned by

---

[4]Mack testified that he did not administer the test to Marshall Keys. Nor could he say with certainty that the results which he reviewed were actually those of Keys, though he did indicate that the number assigned to the Keys test comported with the results he analyzed.

7

Mack or anyone else. For all we know, they and their components could be mathematically based, founded upon indisputable empirical research, or simply the magic of young Harry Potters' mixing potions at the Hogwarts School of Witchcraft and Wizardry.[5] Again, Mack simply interpreted the "information" returned from Atlanta. How that undeniably pivotal "information" was contrived or applied by those in Atlanta remains a mystery, given the record before us and the trial court.

Nor did the CPS proffer any evidence explaining the "danger registry" and like concepts utilized by Mack to conclude that Marshall and the youths around him were at "significant" risk. What they were, how they were contrived, and whether they were subjected to critical analysis are also subjects completely left to the imagination of the court. Maybe they too have indisputable scientific basis. Or, maybe they simply accompanied the prophesies of Macbeth's demise floating from the cauldron of the three blind witches.[6] We do not know. Nor was the trial court provided with evidence allowing it to make that determination.[7]

Simply put, the gatekeeper at bar could not "evaluate the methods, analysis, and principles relied upon [by Mack] in reaching [his] opinion" about Marshall Keys without evidence of the various crucial methods and principles underlying that opinion and their

---

[5]J. K. ROWLING, HARRY POTTER AND THE SORCERER'S STONE (1998).

[6]WILLIAM SHAKESPEARE, MACBETH, act 4, sc. 1.

[7]Indeed, that those who developed the Abel Assessment believe adult heterosexual males who show sexual interest in adolescent females and adult homosexual males who express interest in adolescent males *are normal or non-deviant* (as Mack so testified) makes the explanation of their methodology and formulas all the more important.

accuracy. And, by admitting the alleged expert evidence without that evidence, the trial court abused its discretion.[8]

Having found error, we next determine its harm, if any. And, in doing so, we cannot deny the emotional effect evidence of pedophilic behavior has on rational human beings. Nor can we deny the emotive effect upon a sane jury of evidence illustrating that the children of the supposed pedophile were at "significant" risk. And, it was this theme of pedophilia and risk to children that comprised a major basis for the relief sought by the CPS. That this is undoubtedly true is exemplified by the agencies opening and closing argument. During the former, it told the jurors about how the Abel Assessment would establish Marshall to be sexually deviant while in its summation it urged how it proved he posed "a significant risk of sexual abuse to these three kids . . . ."

And, that the evidence in question had impact upon Rose Keys is similarly unquestionable. Admittedly, Mack said nothing about her having undergone Abel Assessment. Nevertheless, the CPS used the assessment of Marshall to facilitate their argument that:

> [w]hat we showed you and what we told you that we would show you is these children are in danger. They are in danger of sexual abuse by Mr. Keys *and* Mrs. Keys, one, because he is a perpetrator that is untreated and denies doing anything wrong, and she because she doesn't believe he did anything wrong and she never took any steps *to protect her kids from him and wouldn't today*.

---

[8]In so holding, we do not categorize the Abel Assessment as inadmissible junk science. We simply conclude that the CPS failed to satisfy *Robinson* and its progeny in offering testimony about how it illustrated that Marshall posed a "significant" risk of sexually abusing his children.

(Emphasis added). Simply put, the contention that Rose is bad because she would not today protect her children from the sexual predations of Marshall would have no basis without evidence of Marshall's present and future sexual deviancy. And, it was the Abel Assessment, as discussed by Mack, which provided the evidence. At the very least, jurors could reasonably surmise from the testimony of Mack that because Marshall posed a significant risk of sexually preying on his children and Rose would do nothing about it, she too 1) knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered their physical or emotional well-being or 2) engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered their physical or emotional well-being.

In sum, reasonable minds could debate whether a jury would have voted to terminate the parental rights of the Keys had the alleged expert testimony at issue been excluded. Yet, we have no doubt that using the Abel Assessment to categorize Marshall as all but a pedophile who posed "significant" risk to his children (a risk his wife supposedly would not protect them against) assured the outcome desired by the CPS. *See Academy Corp. v. Interior Buildout & Turnkey Constr., Inc.*, 21 S.W.3d 732, 737-38 (Tex. App.--Houston [14th Dist.] 2000, no pet.) (holding that an appellant suffers reversible harm when the judgment turns on improperly admitted evidence). So, the inadmissible evidence before us probably caused the rendition of the judgment at bar and resulted in the Keys suffering harm. *See* TEX. R. APP. PROC. 44.1(a)(1) (stating that error warrants reversal when it probably caused the rendition of an improper judgment).

10

Having sustained the Keys' point regarding Mack's expert testimony, we need not address whether the trial court erred in admitting evidence of Marshall's 1977 conviction. Instead, we reverse the judgment and remand the cause for further proceedings.

Brian Quinn
Justice

Publish.