Virginia BRUMLEY, Individually and as Representative of the Estate of Earnest Brumley, Heather Brumley, Gina Brumley Forrest, Earnest Brumley, Jr., and Michael Brumley, Plaintiffs,

v.

PFIZER, INC., Defendant.

No. CIV. A. C–00–160.

United States District Court, S.D. Texas, Corpus Christi Division.

June 7, 2001.

---

Darrell Lee Barger, Barger Hermansen et al., Mikal C. Watts, Harris and Watts, Michael Maldonado, Attorney at Law, Corpus Christi, TX, Jose G. Gonzalez, Jr., Attorney at Law, San Antonio, TX, Roger Sherman Braugh, Jr., Attorney at Law, Corpus Christi, TX, for plaintiffs.

Jack Edward Urquhart, Beirne Maynard & Parsons, Norma Laura De Santos, Beirne Maynard & Parsons, Houston, TX, for defendant.

## ORDER CONCERNING ADMISSIBILITY OF EXPERT WITNESS OPINIONS

JACK, District Judge.

On May 14, 2001, the Court heard evidence and argument concerning the Defendant's motion to exclude testimony by the Plaintiff's experts. For the reasons stated below, the Court GRANTS Pfizer's motion to exclude the expert testimony of Dr. Gerald Polukoff to the extent the testimony goes beyond the opinions stated in his Rule 26 report. The Court also GRANTS Pfizer's unopposed motion to exclude the expert testimony of Dr. Sanjay Kaul.

### I. JURISDICTION

The Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332.

### II. FACTUAL BACKGROUND

This is a product liability action involving Viagra (sildenafil citrate), a prescription medication manufactured by Pfizer for the treatment of erectile dysfunction (ED). Dr. Jack Brackin, a medical doctor in Aransas County, Texas, prescribed Viagra to Decedent Earnest Brumley on April 28, 1998. (Brief in Support of Summary Judgment Motion at 5). Upon taking his first dose of Viagra, Mr. Brumley died on May 15, 1998 of cardiac complications after having sexual intercourse. (Brief in Support of Summary Judgment Motion at 5; Exhibit A to Summary Judgment Motion at 3).

It is undisputed that at the time of his death, Mr. Brumley suffered from heart disease. He had undergone coronary artery bypass surgery. He suffered from at least twice-weekly angina attacks, for which Dr. Brackin had prescribed nitroglycerin tablets. Mr. Brumley had a history of angina during sexual intercourse. He smoked 1–1/2 to 2 packs of cigarettes daily, suffered from chronic pulmonary obstructive disease, and was obese. He also had a strong family

history of heart disease. Both Plaintiffs' and Defendant's experts agree that Mr. Brumley was at a high risk for a heart attack.

At the time that Dr. Brackin prescribed Viagra for Mr. Brumley, the packet insert for Viagra carried the following language:

## CONTRAINDICATIONS

... Consistent with its known effects on the nitric oxide/cGMP pathway (see CLINICAL PHARMACOLOGY), Viagra was shown to potentiate the hypotensive effects of nitrates, and its administration to patients who are concurrently using organic nitrates in any form is therefore contraindicated.

## PRECAUTION

General

A thorough medical history and physical examination should be undertaken to diagnose erectile dysfunction, determine potential underlying causes, and identify appropriate treatment.

There is a degree of cardiac risk associated with sexual activity; therefore, the physician may wish to consider the cardiovascular status of their patients prior to initiating any treatment for erectile dysfunction.

(Emphasis supplied). Sometime later, the wording of the contraindication was changed to specify that taking nitrates intermittently was a contraindication for Viagra.

When Dr. Brackin prescribed Viagra to Mr. Brumley, Pfizer had not yet modified the contraindication. Dr. Brackin instructed Mr. Brumley to avoid using his nitroglycerin tablets within 24 hours of taking Viagra and that if he suffered from angina during or after sexual intercourse, to go directly to the hospital. It is undisputed that angina is a symptom of coronary artery disease that occurs as a result of decreased blood flow in the coronary arteries to the heart muscle. Further, nitrates such as nitroglycerine are used to dilate the coronary arteries to increase the blood flow to the muscle and thereby decreasing the muscle pain exhibited by angina. After his first dose of Viagra, Mr. Brumley engaged in sexual intercourse and died some two hours later. An autopsy found that Mr. Brumley's death was caused by "cardiac arrhythmia with accompanying severe ischemic cardiomyopathy."

Plaintiffs now assert claims against Pfizer for strict liability, marketing defects, and negligent marketing. On March 15, 2001, Pfizer moved for summary judgment, arguing first, that there is no evidence that Viagra caused the death of Mr. Brumley, and second, that Pfizer provided adequate warnings as to the proper use of the drug.

In their summary judgment response, Plaintiffs offered the opinion of Dr. Gerald Polukoff that linked Viagra to cardiac risk. Dr. Polukoff had produced a Rule 26 report in February of 2001. That initial report stated that "Viagra (Sildenafil) and sexual intercourse triggered the untimely death of Mr. Earnest Brumley because Viagra (Sildenafil) enables sexual activity in patients at increased risk to cardiovascular events and death."

Dr. Polukoff also executed an April 5, 2001 affidavit in response to Defendant's motion for summary judgment. That affidavit restates the opinion contained in the Rule 26 report that Mr. Brumley's death resulted from his participation in vigorous sexual activity enabled by Viagra, but the affidavit also adds the following, previously undisclosed, opinion:

Viagra causes a marked increase in sympathetic activation. Increased sympathetic activation is associated with myocardial ischemia, myocardial infarction, malignant and fatal arrhythmias and sudden cardiac death; therefore, Mr. Brumley would have survived sex were it not for his ingestion of Viagra on the night of his death.

Pfizer moved to exclude the second opinion because it was not previously disclosed as required by Rule 26, and because the opinion did not have a valid scientific foundation. The Court held a *Daubert* hearing on May 14, 2001. At the hearing and during his deposition, Dr. Polukoff testified that he discerned a direct link between the use of Viagra and increased cardiac risk after reading a report authored by Brady Phillips (the "Phillips Report"). *See* Phillips, B.G., et al., "Sympathetic Activation by Sildenafil", 102

Circulation 3068–3073 (Dec.2000). Dr. Polukoff theorized that he can "extrapolate [Phillips'] findings and apply them to our findings and our understanding that our patients with coronary artery disease are at risk for death or infarction with sexual activity, and that this risk may actually be exacerbated or heightened with common use of sildenafil." (Polukoff Deposition at 279).

The Phillips report demonstrated that Viagra produced a rise in catecholamine levels in the volunteers who participated in his study. At the *Daubert* hearing, Dr. Polukoff asserted that the rise in catecholamine levels in the Phillips report "demonstrates the mechanism by which there's people dropping dead with Viagra. It's a sentinel paper." Dr. Polukoff opined that catecholamines are "clearly known to alter cardiovascular outcome ... adversely." Although he posited that the catecholamine levels in the report were elevated over levels that would be observed in people at rest, he acknowledged that they were not abnormal for someone engaged in physical activity. Importantly, he could not cite any studies nor could he identify or quantify what are normal or abnormal levels of catecholamines.

Dr. Polukoff then concentrated on the following language from the Phillips study: "Nevertheless, it is reasonable to assume, first, that increased sympathetic drive may contribute to the initiation of cardiovascular events, and second, that cardiovascular events, particularly arrhythmias and myocardial infarction, that occur in the setting of a high level of sympathetic activation are likely to have poorer outcomes." Phillips Report at 3072. Dr. Polukoff agreed that the Phillips study did not actually demonstrate that Viagra has an adverse effect on cardiac risk, nor did it claim to do so. Nowhere does the Phillips Report conclude that the increased catecholamine levels actually have a detrimental effect on heart functioning in healthy or diseased cardiovascular systems. Rather, the study suggested that these are important subjects for future study.

When asked whether there are any studies, apart from the Phillips Report, that demonstrate an adverse effect of Viagra on the heart, Dr. Polukoff stated, "The studies that have been done to date that look at patients with ischemic heart disease and coronary artery disease and Viagra are short-term studies without long-term follow-ups, small populations, and have inconclusive data."

Dr. Polukoff also testified that the warning that Pfizer included with Viagra is insufficient to inform physicians of the risks that patients with ischemic heart disease may encounter with Viagra. Dr. Polukoff asserted that advising against prescribing Viagra to patients taking nitrates "in any form" was not specific enough to alert physicians that patients intermittently taking sublingual nitroglycerin tablets should not take Viagra. This simply does not comport with the wording of the insert. The insert contained more than a warning, it stated that taking nitrates "in any form" was a contraindication for Viagra, and the contraindication clearly included all nitrate use, whether intermittent, sublingual, daily, or otherwise.

Dr. Polukoff conceded that, when Viagra first appeared, notwithstanding the language of the insert, he prescribed Viagra to patients who suffered from angina. He warned them that they should not use Viagra within 24 hours of using nitroglycerin and that, if they took Viagra and experienced angina symptoms, they should first cease any physical activity. He further warned them that if the pain persisted, they should immediately go to the emergency room. Dr. Polukoff continues to give precisely this warning, even after Pfizer changed the contraindication to refer specifically to patients taking nitrates intermittently.

The warning that Dr. Polukoff gives now and has always given to his patients with angina is the same warning that Mr. Brumley received. Dr. Brackin warned Mr. Brumley that if he experienced angina after taking Viagra, he should proceed directly to the hospital. Dr. Polukoff acknowledged that this warning is somewhat unrealistic: when patients need to take nitroglycerin, they need it immediately, and there is a risk that they may not make it to the hospital. Dr. Polukoff asserted that many patients, understanding this risk, nevertheless choose to take Viagra because of the importance of sexual activity to their quality of life. The

Court recognizes that this may be a compelling consideration for doctors and their patients, but it does not render the Pfizer warning inadequate. The Viagra insert, both when Mr. Brumley was prescribed it and now, clearly indicates that patients taking nitrates should not take Viagra.

### III. LEGAL STANDARD

■ Federal Rule of Evidence 702 provides, "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence ..., a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Rule 702 requires a court to evaluate the proffered expert opinions to determine if these opinions are admissible. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 2795, 125 L.Ed.2d 469 (1993) (Rule 702 "clearly contemplates some degree of regulation of the subjects and theories about which an expert may testify"). In making this determination, the Court is guided by Fed.R.Evid. 702 and the Supreme Court's ruling in *Daubert. See also Tanner v. Westbrook,* 174 F.3d 542, 545 (5th Cir.1999) ("*Daubert* requires that when expert testimony is offered, the trial judge must perform a screening function to ensure that the expert's opinion is reliable and relevant to the facts at issue in the case.").

In *Daubert,* the Supreme Court set fourth a two-step analysis for expert opinions:

Faced with a proffer of expert scientific testimony, then, the trial judge must determine whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether the reasoning or methodology properly can be applied to the facts in issue.

*Daubert,* 113 S.Ct. at 2796, 113 S.Ct. 2786. *See also Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 1175, 143 L.Ed.2d 238 (1999) (stating that when an expert's "testimony's factual basis, data, principles, methods, or their application are called sufficiently into question..., the trial judge must determine whether the testimony has a reliable basis in the knowledge and experience of the relevant discipline.").

■ Under *Daubert,* a trial judge need not and should not determine the scientific validity of the conclusions offered by an expert witness; rather, to decide admissibility the judge should consider only the soundness of the general scientific principles or reasoning on which the expert relies and the propriety of the methodology applying those principles to the specific facts of the case. *Id.* at 2797; *Watkins v. Telsmith, Inc.,* 121 F.3d 984 (5th Cir.1997); *Joiner v. General Electric Co.,* 78 F.3d 524, 530 (11th Cir.1996).

■ The *Daubert* Court issued a non-exclusive list of four criteria to guide trial courts in determining if the testimony is reliable "scientific knowledge": (1) whether the theory or technique in question can be and has been tested, (2) whether it has been subjected to peer review and publication, (3) its known or potential rate of error along with the existence and maintenance of standards controlling the technique's operation, and (4) the degree of acceptance within the relevant scientific community (*i.e.,* the *Frye* test). *Id.* at 2796–2797; *see also Frye v. United States,* 54 App.D.C. 46, 47, 293 F. 1013, 1014 (1923). After determining whether the opinion is reliable, the Court must then look to the second prong of the *Daubert* test and determine if the science "fits" the situation at hand. *Daubert,* 113 S.Ct. at 2794. An expert opinion must be based on facts that enable the expert "to express a reasonably accurate conclusion as opposed to conjecture or speculation." *Kieffer v. Weston Land, Inc.,* 90 F.3d 1496, 1499 (10th Cir.1996) (holding that an expert could not testify as to the injury which a defect could have cause the plaintiff where the expert had no reasonable grounds for belief that such a defect existed when the alleged injury occurred). In *Christophersen v. Allied–Signal Corp.,* 939 F.2d 1106, 1113–1114 (5th Cir. 1991), the Fifth Circuit approved the exclusion of the plaintiff's expert's opinion premised on a twenty-year history of exposure while the plaintiff had experienced only four-

teen years of exposure. That is, the trial court may exclude evidence when based on inaccurate or purely hypothetical premises.

The trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system: "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert,* 113 S.Ct. at 2798; *U.S. v. 14.38 Acres of Land,* 80 F.3d 1074, 1078 (5th Cir. 1996).

## IV. BURDEN OF PROOF

Admissibility of expert testimony is an issue to be resolved by the trial judge under Federal Rule of Evidence 104(a). *Daubert,* 113 S.Ct. at 2796. Therefore, the judge need only find by a preponderance of the evidence that the expert's reasoning and methodology is scientifically valid. *Bourjaily v. U.S.,* 483 U.S. 171, 107 S.Ct. 2775, 2778–2779, 97 L.Ed.2d 144.

The *Daubert* court emphasized that, in making this inquiry, trial judges must be accorded significant discretion. *Daubert,* 113 S.Ct. at 2797. *See also General Elec. Co. v. Joiner,* 522 U.S. 136, 147 (1997). The Fifth Circuit has repeatedly affirmed that the district courts "enjoy wide latitude in determining the admissibility of expert testimony," and "the discretion of the trial judge and his or her decision will not be disturbed on appeal unless 'manifestly erroneous.'" *Watkins v. Telsmith* 121 F.3d at 988; *Eiland v. Westinghouse Electric,* 58 F.3d 176, 180 (5th Cir.1995).

## V. CHALLENGES TO POLUKOFF OPINION

■ Plaintiffs contend that Pfizer defectively marketed Viagra and that the use of Viagra was both a proximate cause and a producing cause of Mr. Brumley's death. Their principal evidence in support of these claims is the expert testimony of Dr. Gerald Polukoff, M.D., Ph.D., who is an adjunct member of the faculty of the Utah School of Medicine and who is certified by the American Board of Internal Medicine with a subspecialty in cardiovascular disease. There is no dispute between the parties that Dr. Polukoff is qualified as an expert in the field of medicine.

Pfizer challenges Dr. Polukoff's April 5, 2001 affidavit on two separate grounds. First, Pfizer contends that his opinion, linking the pharmacological effect of Viagra to heightened cardiac risk, does not satisfy the requirements of *Daubert.* Second, the affidavit was not timely disclosed in accordance with the Court's Scheduling Order and Fed. R.Civ.P. 26.

### A. Admissibility under Daubert

As noted above, *Daubert* supplies a four-part test for scientific opinions: (1) whether the theory or technique in question can be and has been tested, (2) whether it has been subjected to peer review and publication, (3) its known or potential rate of error along with the existence and maintenance of standards controlling the technique's operation, and (4) the degree of acceptance within the relevant scientific community. Although the *Daubert* court emphasized that this test is not the only means to examine expert testimony, the Court finds that it is appropriate in this case.

Before turning to the four factors, the Court summarizes Dr. Polukoff's opinion. Although he stated his opinion in terms of sympathetic nerve activity in his April 2001 affidavit, it is clear that he now views Viagra's effect on catecholamine levels as adversely affecting sympathetic nerve activity, in turn resulting in cardiac risk; as Dr. Polukoff testified, the Phillips report "demonstrates the mechanism" by which Viagra subjects the heart muscle to increased sympathetic nerve activity. Dr. Polukoff's opinion is that Viagra increases the levels of catecholamines in the blood, which increased sympathetic nerve activity, which has an adverse effect on the heart, which in turn results in increased cardiac risk in patients with ischemic heart disease.

### Testability

There is no question that Dr. Polukoff's theory can be tested; the problem is that it has not been tested. Dr. Polukoff acknowledges that the Phillips study does not, itself,

demonstrate that Viagra has any adverse effect on the functioning of healthy or diseased cardiovascular systems.

Plaintiffs respond in two ways. First, they asserted during argument that the mere fact of testability makes Dr. Polukoff's opinion admissible. The "testability" requirement is a threshold requirement aimed at excluding pseudoscience from the courtroom. A theory that is untestable is unfalsifiable and of no practical value in the courtroom. *See* Foster, Kenneth R. and Peter W. Huber, *Judging Science; Scientific Knowledge and the Federal Courts* Ch. 3 (MIT Press 1997). But to stop the analysis at testability would allow in any theory, even one universally recognized as wrong, merely because it is falsifiable. Moreover, the requirement that a theory be subject to testing is only one prong of a two-part requirement: the question is whether the theory "can be (*and has been*) tested." *Daubert*, 113 S.Ct. at 2796 (emphasis supplied).

Plaintiffs' second response is that Dr. Polukoff's opinion is a valid extrapolation from the data in the Phillips study. The problem is that not even Dr. Polukoff could confidently demonstrate that any extrapolation is possible from the Phillips study. In spite of the suspicion that the Phillips Report may have raised, Dr. Polukoff could not offer any testimony regarding safe levels of catecholamines, nor could he cite to any report that supports a conclusion that the levels in the Phillips Report were unsafe. Plaintiffs cannot use the Phillips study to support a conclusion that the study itself does not make. *See General Electric Co. v. Joiner*, 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997); *see also Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 278–279 (5th Cir.1998) (*en banc*). The "analytical gap" between the Phillips study and Dr. Polukoff's conclusion is simply too great. *See Moore*, 151 F.3d at 277. The strong temporal relationship between Mr. Brumley's first use of Viagra and his sudden death, without more, does not make Dr. Polukoff's opinion any more reliable. *Curtis v. M & S Petroleum, Inc.*, 174 F.3d 661, 670 (5th Cir.1999) (temporal connection standing alone is entitled to little weight).

The Court concludes that Dr. Polukoff's opinion simply is not supported by any real world observations or experimental scrutiny. Although Dr. Polukoff may have identified an area of real concern and an avenue for fruitful study, he has not demonstrated that his opinion is reliable in the sense required to make it admissible.

### Peer Review and Publication

As shown above, no test of Dr. Polukoff's theory has been the subject of a published article. In fact, Dr. Polukoff stressed repeatedly that studies to demonstrate or refute his theory have not been done. Dr. Polukoff acknowledged at the *Daubert* hearing that the only studies that have been reported have concluded that there was no indication that Viagra created any increased cardiac risk. Dr. Polukoff discussed at length a study by Dr. Richard Conti, who surveyed patients with a history of ischemic heart disease. The Conti study did not detect any adverse cardiovascular effects of sildenafil. Dr. Polukoff, however, contends that the meaning of this and other studies is diminished either because they do not focus on patients with ischemic heart disease, or because they relied on self-reporting by patients who had been prescribed Viagra. In essence, Dr. Polukoff concluded that Viagra is unsafe because no study has tested whether it is safe for patients with ischemic heart disease who engage in sexual activity.

Dr. Polukoff may have pointed out an important void in the scientific literature, but the lack of proof of a drug's safety does not prove it is dangerous. It may be advisable to assume that Viagra is dangerous for patients with ischemic heart disease, given the lack of evidence to the contrary, but in a lawsuit where the plaintiff bears the burden of proving that a drug is dangerous, the Court cannot assume that element of the plaintiff's claim.

### Rate of Error

Given that Dr. Polukoff's opinion has failed the first two factors of the *Daubert* analysis, the Court concludes that the third factor simply does not apply. The Court cannot assess the "known rate of error" for a theory that has no empirical foundation.

### Acceptance within Scientific Community

Dr. Polukoff testified that the American Heart Assocation and the American College of Cardiology have developed recommended guidelines for physicians who prescribe Viagra to patients with heart disease, including those who use nitrates. Dr. Polukoff emphasized that these associations developed these guidelines in the face of the real world challenge of advising patients who suffer from both erectile dysfunction (ED) and coronary artery disease (CAD). Dr. Polukoff noted that a large percentage of ED sufferers also are CAD sufferers, and the compelling importance of sexual activity to one's quality of life has resulted in overwhelming demand for Viagra from those patients for whom it may be contraindicated. The consensus appears to be that it is dangerous for certain CAD patients to take Viagra, but that patients who are informed of all of the risks should be entitled to make a decision whether those risks are acceptable.

The Court concludes that this is some evidence that a degree of risk to CAD patients has become acceptable to physicians within the medical community, but it is not evidence that Viagra poses any greater danger than is acknowledged in the insert that Pfizer included with the medication. The fact that the medical community may have developed an approach to a demand from patients does not count as evidence of an acceptance of a very specific theory that Viagra's effect on the sympathetic nerve system exacerbates cardiac risk in patients with ischemic heart disease.

### Conclusion

The Court concludes that Plaintiffs have not sustained their burden of demonstrating the reliability of Dr. Polukoff's opinion.

### B. Timely Disclosure of Dr. Polukoff's Opinion

Separate and apart from the admissibility of Dr. Polukoff's testimony under *Daubert*, Pfizer argues that Dr. Polukoff's April 5, 2001 affidavit, submitted after the end of discovery, is materially different from his Rule 26 expert report submitted on February 15, 2001. Therefore, the April 5, 2001 affidavit was not timely disclosed as required under Fed.R.Civ.P. 26, and Pfizer seeks to exclude the testimony contained in the affidavit to the extent it goes beyond the opinions stated in his Rule 26 report.

Fed.R.Civ.P. 26(a)(2)(B) states, "The [expert] report shall contain a complete statement of all opinions to be expressed and the basis and reasons therefor; the data or other information considered by the witness in forming the opinions; [and] any exhibits to be used as a summary of or support for the opinions...." Fed.R.Civ.P. 26(a)(2)(B). *See also Adkins v. Vision Claim Service,* 2001 U.S. Dist. Lexis 5624, 4 (N.D.Tex.2001). Additionally, Rule 26(e)(1) requires that the expert's disclosure be supplemented if there are any additions or changes to the information previously disclosed. Fed.R.Civ.P. 26(e)(1).

■ An expert's report must be "detailed and complete" in order to "avoid the disclosure of sketchy and vague expert information." *Sierra Club, Lone Star Chapter v. Cedar Point Oil Co., Inc.,* 73 F.3d 546, 571 (5th Cir.1996). Preliminary reports do not satisfy the express terms of Rule 26. *Sherrod v. Lingle,* 223 F.3d 605, 612 (7th Cir. 2000). Rule 26(a) clearly requires that the initial disclosure be complete and detailed. *Sierra Club, Lone Star Chapter,* 73 F.3d at 569.

■ A subsequent expert affidavit submitted to rebut a summary judgment motion may be excluded if it differs from an earlier Rule 26 report. *See Marilyn Hopkins v. NCR Corp.,* 1994 WL 757510, *5, 1994 U.S. Dist. Lexis 17273, 18 (M.D.La.1994). A district court has broad discretion on discovery matters, including its decision to issue sanctions for discovery violations. *Sierra Club, Lone Star Chapter,* 73 F.3d at 569.

■ Plaintiffs retained Dr. Polukoff on February 14, 2001, and he issued his Rule 26 report the next day. A review of the report and the affidavit shows that the affidavit adds a new theory of causation that was not contained in Dr. Polukoff's Rule 26 report. The report simply maintains that Viagra enables sexual activity, which leads to increased cardiac risk. The affidavit adds the wholly

new theory that the pharmacological effect of Viagra inherently increases cardiac risks independent of sexual activity. Dr. Polukoff based this theory on the Phillips Report, which was published in December 2000; at the *Daubert* hearing, Dr. Polukoff conceded he had not read the Phillips Report until after his Rule 26 report was filed.

Moreover, at the *Daubert* hearing, Dr. Polukoff stated the additional opinion that the language of the Viagra package insert was inadequate to inform Mr. Brumley's physician of the risk to patients with coronary artery disease; this opinion was not contained in his Rule 26 report. Pfizer included in its motion to exclude Dr. Polukoff's testimony a request to "exclude any testimony by Polukoff that goes beyond the initial report." Defendant Pfizer, Inc.' Amended Motion to Exclude the Testimony of Plaintiffs' Designated Expert at 2. Pfizer's motion discussed only Dr. Polukoff's opinion regarding the pharmacological effects of Viagra, because Dr. Polukoff's April affidavit did not state his opinion that the package insert was inadequate. Nevertheless, given the request to exclude all testimony that "goes beyond the initial report", the Court will exclude the opinion regarding the package insert as well.

Since Rule 26 requires " a complete statement of all opinions to be expressed," Dr. Polukoff's new opinions fail to comply with Rule 26 because his Rule 26 report did not contain those opinions. Therefore, the Court finds that Dr. Polukoff's April 5, 2001 affidavit is untimely under Rule 26 to the extent that it goes beyond the opinions in his report, as is his opinion regarding the package insert. The Court strikes both his opinion regarding the pharmacological effects of Viagra and his opinion that the package insert was inadequate, and any other opinion that was not contained in the initial Rule 26 report.

Plaintiffs also violated Rule 26, and the Joint Discovery/Case Management Plan by proffering Dr. Polukoff for deposition on April 6, 2001, the last day of discovery.[1] Under this Court's Scheduling Order, discov-

ery ends two weeks after the deadline for dispositive motions. *See Brumley, et al. v. Pfizer,* Civil No. C–00–160 (S.D.Tex. June 14, 2000) (Scheduling Order at 2). The deadline for summary judgment motions in this case was March 15, 2001. The belated deposition of Dr. Polukoff forced Pfizer to file supplemental pleadings in order to effectively address Dr. Polukoff's deposition testimony and the opinions contained in his April 5, 2001 affidavit which were not in his initial Rule 26 report. The only reason discovery cutoff is two weeks after the deadline for dispositive motions is to enable a plaintiff to conduct discovery for a summary judgment response. The discovery deadline is not intended to enable a party to withhold expert witnesses until the last minute so as to hinder the other party from filing a proper summary judgment motion.

Therefore, due to the untimeliness of Dr. Polukoff's affidavit as well as Plaintiffs' discovery abuse by not proffering him for deposition in a timely manner, the Court finds that the opinions in the affidavit should be excluded, pursuant to Rule 26, to the extent they go beyond the opinions contained in Dr. Polukoff's Rule 26 report.

## VI. MOTION TO EXCLUDE THE EXPERT TESTIMONY OF DR. SANJAY KAUL

Pfizer moves to exclude the expert testimony of Dr. Kaul on the basis that Plaintiffs have not produced an expert report for Dr. Kaul in compliance with Fed.R.Civ.P. 26(a) and this Court's June 13, 2000 Scheduling Order. Plaintiffs filed no response to Defendant's motion to exclude Dr. Kaul's testimony, and at the May 14, 2001 *Daubert* hearing, Plaintiffs asserted that they would not oppose the motion. Accordingly, the Court grants Defendant's motion.

## VII. CONCLUSION

For the foregoing reasons, the Court GRANTS Pfizer's motion to exclude the expert testimony of Dr. Gerald Polukoff to the extent the testimony goes beyond the opin-

---

1. The Joint Discovery/Case Management Plan filed by the parties pursuant to Fed.R.Civ.P. 26(f) stated, "Plaintiffs contend that depositions could begin within two weeks of the initial pretrial conference and be completed by September 29, 2000."